Betty Ann MONEY, Appellant,

v.

Melvyn D. MONEY, Appellee.

No. S–4864.

Supreme Court of Alaska.

May 21, 1993.

---

Linda M. Cerro, and R. Scott Taylor, Rice, Volland and Gleason, Anchorage, for appellant.

Mark H. Wittow and Frances S. Purdy, Preston Thorgrimson Shidler Gates & Ellis, and Jeffrey M. Feldman, Young, Sanders & Feldman, Anchorage, for appellee.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

### OPINION

BURKE, Justice.

## I. *INTRODUCTION*

In this divorce case, Betty Money ("Betty") appeals the superior court's Findings of Fact and Conclusions of Law, its open court decision on reconsideration and its Decree of Divorce. Betty asks this court to reverse the superior court's property division, its alimony and child support awards, its valuation of a closely held corporation, and its attorney's fee award. She also argues the superior court erred in not considering the tax consequences of the property division, in determining that a life insurance policy belonged to Melvyn Money ("Melvyn"), and in not requiring Melvyn to post security for his obligations.

The superior court erred only in not considering relevant statutory factors when dividing the marital property. The case is remanded for this purpose. Otherwise, we affirm.

## II. *DISCUSSION*

### A. THE DISTRIBUTION OF MARITAL PROPERTY.

#### 1. *The Equal Division*

The superior court divided the marital property equally, without comment. Betty asks this court to overturn the property division because the court failed to consider relevant statutory, or *"Merrill"* factors.[1]

It is well settled that the superior court must state the facts upon which it bases its property division. *Merrill v. Merrill,* 368 P.2d 546, 547–48 (Alaska 1962). We have remanded cases where the superior court failed to do this. *See, e.g. Lang v. Lang,* 741 P.2d 1193, 1195–96 (Alaska 1987) (superior court must supply the appellate court with a clear understanding of the basis of its decision); *Brooks v. Brooks,* 677 P.2d 1230, 1233–34 (Alaska 1984) (remand appropriate where there was nothing in the record to indicate what weight the superior court gave to husband's physical problems).

In the present case, the superior court failed to address any of the relevant statutory factors. While it is true that an equal distribution is presumptively equitable, *Burcell v. Burcell,* 713 P.2d 802, 805 (Alaska 1986), it was incumbent upon the superior court to address the evidence Bet-

---

**1.** The factors this court articulated in *Merrill v. Merrill,* 368 P.2d 546, 547–48 n. 4 (Alaska 1962), have been codified at AS 25.24.160(a)(4).

ty presented. *Lang,* 741 P.2d at 1193; *Brooks,* 677 P.2d at 1230.

On remand, the superior court should consider the factors identified in AS 25.24.-160(a)(4)(A) through (I) with particular emphasis to the earning capacities of the parties, the health of the parties, and the income producing capacity of the properties.

### 2. *The Valuation of Parts, Inc.*

■ The superior court determined that Parts, Inc. should be valued at $600,-000. The clearly erroneous standard of review applies to this determination. *Moffitt v. Moffitt,* 749 P.2d 343, 346 (Alaska 1988). A finding is clearly erroneous and should be set aside when the court is left with a definite and firm conviction on the entire record that a mistake has been made. *Peters v. Juneau–Douglas Girl Scout Council,* 519 P.2d 826, 833 (Alaska 1974). The record supports the superior court's valuation.

■ Melvyn's expert CPA, Daniel Hewko, used two different methods to value Parts, Inc.: 1) capitalization of earnings and 2) the purchase price provided by the Stock Purchase and Redemption Agreement (the "buy-sell agreement"). Under the first, he valued the property at $562,-000; under the second, at $600,000.

Hewko considered the buy-sell agreement to be the best indicator of value of Melvyn's share in Parts, Inc. Under the agreement, a shareholder interested in selling his stock must first offer it to the corporation. If the corporation declines, then individual stockholders have a 30 day option to purchase the stock. Hewko testified that no "prudent investor" would pay more for Melvyn's share than the price established by the agreement.

Ted Sherwinn, Betty's expert CPA, agreed that the value of Melvyn's share of Parts, Inc. under the buy-sell agreement was $600,000, but suggested that this value was "not necessarily indicative of fair market value." He theorized that shareholders may deflate the value of the stock for estate tax purposes. Betty points out that the buy-sell agreement provided that the agreement price "may not accurately re-flect the fair market value of the Stock." She also notes that some courts are cautious about using buy-sell agreement valuations. *See, e.g. In re Marriage of Hall,* 103 Wash.2d 236, 692 P.2d 175, 180 (1984) (suggesting that a court relying on a buy-sell agreement valuation should determine what factors other than fair market value were considered in setting the price).

■ However, other courts have approved the use of buy-sell agreement valuations for valuing closely held corporations in divorce cases. *See, e.g. Hertz v. Hertz,* 99 N.M. 320, 657 P.2d 1169, 1174 (1983) ("[A] non-shareholder spouse is bound to the same terms of a shareholder valuation agreement which affects the shareholder spouse. This insures that the non-shareholder spouse does not receive a *greater* value than that of the shareholder."); *Amodio v. Amodio,* 70 N.Y.2d 5, 516 N.Y.S.2d 923, 924, 509 N.E.2d 936, 937 (1987) (price fixed by a buy-sell agreement, though not conclusive, should be considered). We hold that a trial court is not bound by a buy-sell agreement valuation, but may consider such a valuation when valuing marital property, especially when that valuation is supported by other valuation methods.

Hewko's valuation under the buy-sell agreement is corroborated by his capitalization of earnings valuation of $562,000. Hewko used Sherwinn's calculations, with one exception: For each year, he subtracted an "Additional Income Tax Payable." Betty complains that these taxes are "entirely fictional." Hewko's reason for subtracting them makes sense: If bonuses and profit sharing are added back into each year's net income as if they were never distributed, then the taxes payable on the increased income should also be recomputed.

Betty also argues that Hewko's valuation is clearly erroneous because, for 1990, he ignored Parts, Inc.'s status as a Subchapter S corporation. As a Subchapter S corporation, Parts, Inc. passes its tax burden on to its shareholders who pay a pro-rata share of the corporate taxes. Hewko nevertheless subtracted an "Additional In-

come Tax Payable" for 1990. His theory is that the prudent investor would seek to value Parts, Inc. as he would any other company, and would therefore desire an income figure with income taxes already subtracted. The superior court accepted Hewko's theory. It found fault with Sherwinn's valuation in part because

> Mr. Sherwinn used gross income to calculate valuations of $933,000 and $860,000. The problem with such an approach, of course, is that it applies a multiplier effect to the funds used to pay taxes and establishes a value of the property from which no prudent investor could earn a true return anywhere near the hypothetical amounts being suggested under the assumptions made.

We think this reasoning is sound.

Alternatively, the superior court's capitalization of earnings valuation can be affirmed on an entirely different basis. The parties disputed the minority and marketability discount rates that should be applied to Melvyn's share of Parts, Inc. when calculating a value under the capitalization of earnings method. The discount rates reflect the limited marketability of a minority share in a closely held corporation. Sherwinn used a 15% minority interest discount rate. Hewko testified that minority and marketability discount rates usually average 35%. *But see In re Marriage of Belt*, 65 Or.App. 606, 672 P.2d 1205, 1207–08 (1983) (court applied a 50% discount rate to a minority share in a closely held corporation). The superior court rejected Sherwinn's valuation because it felt that substantially higher minority and marketability discounts than those used by Mr. Sherwinn should have been applied to the business. If Hewko's "average" discount rate of 35% is applied to Sherwinn's valuation, the adjusted valuation becomes $560,000.

The superior court's $600,000 valuation, then, is supported by the buy-sell agreement valuation, by the capitalization of earnings method with hypothetical taxes subtracted, and by the capitalization of earnings method using "average" discount rates. It was not clearly erroneous to factor taxes into the valuation calculus, nor

was it clearly erroneous to use a marketability discount rate higher than 15%. We affirm the superior court's valuation of Parts, Inc.

### 3. The Valuation of the West Coast Life Insurance Policy.

Betty sought an equitable division of the cash value of a whole life insurance policy issued by West Coast Life Insurance Company. The superior court awarded the policy to Melvyn, determining that it was a pre-marital asset.

Melvyn's mother took out the policy for him when he was four years old. He was not sure of its face value, although he thought it was $10,000. Melvyn claims he was not able to produce official records on the policy because that information was not in his possession. Once the parties married, the $13.38 quarterly premiums were paid out of a joint checking account. Melvyn testified that the policy paid dividends which offset the annual premiums.

■ The policy is obviously a pre-marital asset. The properly presented issue is whether the superior court should have invaded this asset to balance the equities between the parties. AS 25.24.160(a)(4). A trial court has broad discretion with respect to invasion of pre-marital assets. *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983). However, we have held that

> [i]n limited circumstances invasion of one spouse's property acquired before coverture may be required as a matter of law. One such circumstance is where the parties, by their actions during marriage, demonstrate their intention to treat specific items of property as joint holdings.... Such intention is manifest when both spouses can be shown to have taken an active interest in the ongoing maintenance, management, and control of specific assets.

*Id.* at 571 (footnote omitted). The fact that the premiums were paid from a joint checking account does not mean that Betty took "an active interest in the maintenance, management, and control of" the policy. Since the premiums equalled the dividends, Betty has not really contributed toward the

maintenance of the asset. The superior court did not abuse its broad discretion by refusing to invade the pre-marital asset.

### 4. Tax Consequences of Property Division.

 Betty argues that the superior court erred in failing to address the tax consequences of its property distribution. She claims that since her maintenance needs were not fulfilled by the alimony and child support awards, she will be forced to sell assets to meet expenses. Betty suggests that if she withdrew her award of $154,000 from Melvyn's profit sharing plan she would realize only $110,800 because of taxes and penalties. Her position is that the superior court should have taken this potential loss into account when dividing the property.

Betty's reliance on *Oberhansly v. Oberhansly*, 798 P.2d 883 (Alaska 1990), is misplaced. In that case, we held that the superior court must consider only the "immediate and specific tax consequences of its division of property.... At the same time, the court is not required to speculate on or to consider tax consequences in the absence of proof that a taxable event will occur in connection with the division of property." *Id.* at 887. In *Oberhansly*, this court directed the superior court to consider the tax consequences of its order requiring a spouse to withdraw his retirement account for property division purposes. The parties in that case agreed that this withdrawal would have immediate tax consequences. *Id.* at 886–87.

The tax consequences Betty theorizes are speculative and not immediate. Unlike the situation in *Oberhansly*, it is far from certain here that "a taxable event will occur in connection with the division of property." *Id.* at 887. Thus, the superior court was not required to consider the tax consequences of the property division.

### 5. Security.

 Betty asked the superior court to require Melvyn to post security for the spousal and child support awards, the mortgages on the two properties Betty received,

and the $89,911 promissory note. The superior court denied the request. This decision will be reviewed for abuse of discretion. *See Hunt v. Hunt*, 698 P.2d 1168, 1171 (Alaska 1985).

Betty argues that to require her to pay for security, or to allow the indebtedness to go unsecured, is not a fair allocation of the economic effect of the divorce. She suggests that Melvyn can easily provide the requested security at no monetary cost to himself by simply pledging shares of his Parts, Inc. stock. She also proposes other alternatives, such as issuing an order that any unpaid support would be an enforceable lien against Melvyn's estate in the event of his death.

These creative suggestions would have come within the ambit of the superior court's discretion. *See H.P.A. v. S.C.A.*, 704 P.2d 205, 210 and n. 4 (Alaska 1985) (approving the use of insurance for child support "where appropriate" and encouraging the use of other creative means to achieve the same result). We cannot, however, conversely say that it was an abuse of discretion to not require security. Betty, of course, is not required to purchase security, and there is nothing in the record to indicate that Melvyn will not cover his obligations. We affirm. *See Hunt*, 698 P.2d at 1171 (husband not required to give wife a security interest to ensure his periodic payment of her share of a business).

### B. ALIMONY

Betty sought alimony of $2500 per month until December 1991, and $2250 monthly support from January 1992 through June 1995. The superior court awarded her rehabilitative alimony of $1000 a month for 24 months "to aid the plaintiff while she is preparing to enter the job market and to organize the considerable non-liquid and non-income producing property being distributed to her from the marital estate." This award will be reviewed for abuse of discretion. *Bays v. Bays*, 807 P.2d 482, 485 (Alaska 1991).

 Although the superior court designated its alimony award as rehabilitative, it appears the court awarded both rehabilita-

tive and reorientation alimony. Rehabilitative alimony is appropriate "when the recipient spouse intends to apply the alimony toward job training designed to lead to employment." *Jones v. Jones*, 835 P.2d 1173, 1178–79 (Alaska 1992). It is "properly limited to job training or other means directly related to the end of securing for one party a source of earned income." *Schanck v. Schanck*, 717 P.2d 1, 5 (Alaska 1986). Reorientation alimony is designed to "allow the requesting spouse an opportunity to adjust to the changed financial circumstances accompanying a divorce." *Jones*, 835 P.2d at 1179 (quoting *Richmond v. Richmond*, 779 P.2d 1211, 1215 n. 6 (Alaska 1989)). By awarding Betty alimony to aid her in preparing for the job market and to help her organize her portion of the marital estate assets, the superior court effectively awarded Betty both rehabilitative and reorientation alimony.

 After reviewing the record, we are satisfied that the superior court's award of $1000 a month for two years achieves the purpose of both rehabilitative and reorientation alimony, which is "to help a spouse adapt to the changed financial circumstances following his or her divorce." *Jones*, 835 P.2d at 1179. We affirm the superior court's alimony award.[2]

## C. CHILD SUPPORT

The parties agreed that Betty should have custody of their two minor children, aged 17 and 4. Betty sought a child support award of $2500 per month through June 1992, adjusted to $1900 thereafter. The superior court awarded her $1350 per month until June 1992 and $1000 thereafter. In addition, it required Melvyn to in-

clude the children on his health insurance plan, and to pay 50% of any uninsured medical expenses. This award will be reversed "only if this court has a definite and firm conviction based on the record as a whole that a mistake has been made or the trial court abused its discretion." *Hunt*, 698 P.2d at 1172.

The parties agreed that Melvyn's annual income was greater than $60,000. The superior court multiplied $60,000 by the percentages found in Civil Rule 90.3(a)(2)(B) to arrive at its award. Rule 90.3(c)(2) allows an additional award only if it is "just and proper, taking into account the needs of the children, the standard of living of the children and the extent to which that standard should be reflective of the supporting parent's ability to pay."

 Betty argues that the court's award is inadequate because it will force her to "invade her equities substantially to not just maintain the children's accustomed standard of living, but to provide for their basic support." The record does not support her contention. Betty submitted a monthly budget with itemized costs totalling $5,261. However, this figure includes mortgage payments on the Money's residence and their Rocky Lake cabin totalling $927.65. According to the property division, Melvyn must make these payments. Betty's budget also does not account for Melvyn's responsibility for half of the children's uninsured health coverage.[3] Subtracting just these two expenses from Betty's budget reduces the monthly total to $3905.

 Rule 90.3 only requires that the non-custodial parent contribute toward the "reasonable" needs of his/her children.

---

2. Betty also argues that the superior court's alimony award should be reversed because it is not enough to meet her expenses. Betty reiterates her *Merrill* factor arguments to support her position that she deserves more alimony. This portion of Betty's alimony argument is distinct from her argument that she needs rehabilitative alimony to pay for her paralegal schooling. *See Schanck* 717 P.2d at 5. Betty's *maintenance* needs should be addressed, on remand, in the property division, not through additional alimony. *Ramsey v. Ramsey*, 834 P.2d 807, 809–10 (Alaska 1992).

3. According to Betty's budget, the children's monthly medical expenses total $857. This figure was arrived at by dividing the monthly psychiatrist expense in half (the budget allocates $830 to Betty and Jennifer's psychiatrist) and adding the $442 allocated to "Insurance (2 children's deduct)." Pursuant to the divorce decree, Melvyn would be responsible for $429 of this expense.

*Coats v. Finn,* 779 P.2d 775, 776 (Alaska 1989). Betty's budget contains a number of expenses that go beyond reasonable need. For example, Betty claimed a $500 expense for her son's summer hockey camp. The superior court refused to require Melvyn to pay this expense, concluding that while Melvyn might choose to contribute to or fund all of the camp's expenses, an order requiring him to do so could not be supported by law or equity. The superior court did not abuse its discretion in making this determination.

The budget includes other questionable expenses. Betty claimed $40 a month for her daughter's gymnastics class. At trial, she admitted that her daughter was not enrolled in such a class. Betty claimed $430 a month for her three year old daughter's psychotherapy sessions. However, evidence at trial indicated that the treatment would only take about six months.

The children's needs can be met by the superior court's award, which followed the Rule 90.3 formula. It was not clearly erroneous to deny an additional award.

### D. ATTORNEY'S FEES

 Betty sought an attorney's fee award of $15,000. After considering the parties' earning ability, the court awarded her $2,500. This award cannot be disturbed unless it is arbitrary or manifestly unreasonable. *Zimin v. Zimin,* 837 P.2d 118, 124 (Alaska 1992).

Melvyn's earning capacity is greater than Betty's. "[I]n deciding whether a fee award is appropriate, the court must also consider the parties' relative economic situations as well as their earning capacity." *Id.* The present case is analogous to *H.P.A. v. S.C.A.,* 704 P.2d 205, 212 (Alaska 1985), where "[t]he crux of Wife's argument is that Husband has a lot more money and greater earning power, and he can much more easily afford to pay her attorney's fees." This court affirmed the denial of fees in *H.P.A.* because "Wife's resources and capabilities are sufficient enough that a court could reasonably expect her to pay her own fees." *Id.*

Betty's half of the property division includes more than enough cash to cover her remaining attorney's fees. *See Siggelkow v. Siggelkow,* 643 P.2d 985, 989 (Alaska 1982) (Wife "received a substantial property award from which she could have paid her attorney's fees."). Since the superior court took the parties' disparate earning capacities into account when it awarded Betty $2500 in attorney's fees, its award will not be disturbed.

### III. CONCLUSION

This case is REMANDED for the superior court to consider those statutory property division factors which may weigh in favor of a greater award to Betty. On all other issues, the superior court is AFFIRMED.