A. John GALLANT, Appellant,

v.

Shannon T. GALLANT, now known as Shannon T. Weed, Appellee.

No. S–4797.

Supreme Court of Alaska.

Sept. 30, 1994.

Order Granting Rehearing in Part and Modifying Opinion Sept. 30, 1994.

A. John Gallant, pro se.

Mark Butterfield and Michael Gershel, Alaska Legal Services Corp., Anchorage, for appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, J. Pro Tem.*

### ORDER

On consideration of the petition for rehearing filed on July 29, 1994,

IT IS ORDERED:

1. The petition is GRANTED with regard to issue one; the opinion is modified by the addition of a new footnote 9 at page 11 and the following footnotes are renumbered. [Editor's Note: Modification incorporated for purposes of publication].

2. The petition is DENIED with regard to issue two.

3. Opinion No. 4098 published on July 1, 1994, is WITHDRAWN.

4. Opinion No. 4122 is issued on this date in its place.

Entered by direction of the Court at Anchorage, Alaska, on September 30, 1994.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, J. Pro Tem.*

* Sitting by assignment made pursuant to article

### OPINION

COMPTON, Justice.

This appeal arises out of a divorce proceeding. The trial court determined the adjusted income levels for each party in order to set child support, divided the husband's pensions evenly, allocated all marital debt to the husband, ordered reorientation alimony paid to the wife for five years and ordered the parties to bear their own attorney's fees and costs. After the court's order on the division of the pensions, but before issuance of a Qualified Domestic Relations Order (QDRO) implementing the order, the husband filed for bankruptcy. The husband challenges the adequacy of the factual findings and argues that the QDRO violates the automatic bankruptcy stay.

We affirm the trial court's issuance of the QDRO. We affirm the adaptation of Civil Rule 90.3 to this third-party custodial situation. We remand for further findings on the issues relating to the parties' adjusted incomes, the allocation of marital debt and the award of reorientation alimony.

### I. FACTUAL AND PROCEDURAL BACKGROUND

John Gallant and Shannon Gallant (now Shannon Weed) were married in 1975. They permanently separated in September 1988. They have three children: John Jr., Joshua and Carli.

The marriage suffered from severe financial mismanagement which included the accumulation of substantial credit card debt. Shannon alleged that John made the faulty financial decisions and kept information from her, leaving her without financial control. John alleged that Shannon mismanaged at least some of the finances. In the divorce proceeding, he sought credit for payments made on the debt after separation and for an apportionment of the debt existing at the time of trial. The trial court assigned all marital debt "accrued up until December" 1988 to John.

The primary assets of the marriage were John's Alaska Public Employees' Retirement System (PERS) and Supplemental Benefit System (SBS) pension accounts. The court

IV, section 16 of the Alaska Constitution.

made no findings regarding the value of any assets except the pension accounts. Shortly after John and Shannon separated, John withdrew all of the approximately $27,000 in the PERS account. John testified that he incurred a $2,271.32 tax liability from the premature withdrawal of the PERS funds. The court made no specific findings on this tax liability.

The trial court valued the SBS account at $55,000 [1] and awarded Shannon $41,000 of the account, "which simply represents half of that account and half of the $27,000 PERS account already received and spent by [John]." The trial court found that John and Shannon had adjusted monthly incomes of $3,350 and $1,200 respectively, although the findings do not explain the calculation of the adjusted income figure for either party.[2]

Before trial, the parties agreed that John would have physical custody of Joshua and Carli and that Shannon's sister, Mari Kae Mertz (Mertz), would have physical custody of John Jr. until his majority. Because Civil Rule 90.3 does not provide procedures for calculating support to third-party custodians, the trial court was forced to improvise. The court adopted Shannon's proposed formulation. Each party contributed 33% of his or her income to a pool, which was split between John and Mertz in proportion to the 20% and 27% figures established by Rule 90.3 for one and two children.

The trial court ordered each side to bear its own attorney's fees and awarded reorientation alimony to Shannon.

[T]he fact is that [Shannon] is going to need some assistance in entering the real world. Her job skills at this time allow only for existence. So that she can improve her prospects and alleviate some of the obvious stress she is currently experiencing because of her financial condition, [John] is to pay to her the sum of $300 per month for the next five years beginning September 1, 1991.

The trial was held on July 10–12, 1991.[3] The possibility that John would file for bankruptcy was recognized throughout the trial. On July 18, the trial court issued a Memorandum Order which determined custody, alimony, property division and attorney's fees, and allocated $41,000 of John's SBS pension to Shannon. On August 9, John filed for bankruptcy. On August 23, the trial court entered findings and conclusions and the decree of divorce. On September 13, the trial court entered a QDRO ordering the SBS administrator to transfer $41,000 from John's account to Shannon, plus interest from the date of the Memorandum Order.

## II. *DISCUSSION*

### A. SUFFICIENCY OF FINDINGS RELATING TO CHILD SUPPORT, DIVISION OF MARITAL PROPERTY, REORIENTATION ALIMONY AND ATTORNEY'S FEES AND COSTS.

John challenges the trial court's determination of the parties' income, the allocation of

1. At trial, John originally stated that the SBS account was worth "in the area of $57,000 at the time of separation." After reviewing his notes over lunch, he testified that the real value was $52,000. John's application for a debt consolidation loan in September 1988 listed the SBS account at "$52,000+". In his 1989 financial statement portion of his petition for divorce, John listed the value as $60,130 on May 1989.

2. The pay stubs submitted by Shannon at trial show a net monthly income of $1,204 for April of 1991. John emphasizes that her pay during January, February, and March was higher than $1,200. The evidence shows that her net monthly pay for 1990 was generally lower than $1,200. The figure for John's income seems to have been adopted from Shannon's post-trial memorandum on child support. John testified at trial that he made a baseline salary of "about $3,400." He testified that he was not currently working much

overtime but had made as much as $1,000 per month in overtime pay. In his post-trial memorandum, he calculated his gross income as $3,810 and his net income as $2,690. Shannon disputes the propriety of John's proposed deductions from his gross income.

3. In the points on appeal, John assigns error in the trial court's refusal to extend the time for trial testimony. The trial court has broad discretion to manage its trial calendar. *See Siggelkow v. Siggelkow*, 643 P.2d 985, 987–88 (Alaska 1982) (denying continuance). John's opening brief devotes substantial discussion to the possible prejudicial effect of comments made by the trial court. We do not reach this issue because it was not raised in the points on appeal. Alaska R.App.P. 210(e); *Oceanview Homeowners Ass'n v. Quadrant Constr. & Eng'g*, 680 P.2d 793, 797 (Alaska 1984).

the debt, the award of reorientation alimony and the failure to award attorney's fees. Shannon defends each of these determinations as supported by the record. We remand for further findings on each of these issues.

■ A trial court is required to make specific findings to support a determination of adjusted income under Civil Rule 90.3. *Wright v. Gregorio*, 855 P.2d 772, 773 (Alaska 1993); *Terry v. Terry*, 851 P.2d 837, 837–38 (Alaska 1993). The trial court in this case simply set the adjusted income without explaining its calculation of gross income or the amounts and types of deductions. We remand for specific findings on the parties' adjusted income. *See Adrian v. Adrian*, 838 P.2d 808, 812 (Alaska 1992).

■ A trial court is required to make specific findings to support an equitable division of marital property, including debt. *Lang v. Lang*, 741 P.2d 1193, 1195 (Alaska 1987); *Merrill v. Merrill*, 368 P.2d 546, 548 (Alaska 1962). A court should consider a number of statutory and case law factors in dividing the marital property. AS 25.24.160(a)(4); *Oberhansly v. Oberhansly*, 798 P.2d 883, 884–85 (Alaska 1990); *Merrill*, 368 P.2d at 547–48 & n. 4. In the present case, the trial court allocated all of the marital debts to John, split the pensions, allowed the parties to keep their personal possessions and made no findings regarding any other assets or liabilities. This is insufficient. Even an equal division of property requires some findings to support it. *Money v. Money*, 852 P.2d 1158, 1160–61 (Alaska 1993). We remand for specific findings on the value of significant items of marital property and an explanation of the basis for the distribution of the marital property and debts. On remand, the trial court should value assets

such as that portion of the SBS pension that is marital property as of the date of trial, not separation.[4] *Doyle v. Doyle*, 815 P.2d 366, 369 (Alaska 1991). Because John raised the issue of tax liability for the early withdrawal of his PERS pension, the trial court should also address this issue.[5] *Oberhansly*, 798 P.2d at 887–88.

■ A trial court is required to make specific findings to support a determination that an award of alimony is just and necessary. *Jones v. Jones*, 835 P.2d 1173, 1179 (Alaska 1992). A court should consider a number of statutory and case law factors to determine alimony. AS 25.24.160(a)(2); *Messina v. Messina*, 583 P.2d 804, 805 (Alaska 1978); *Merrill*, 368 P.2d at 547–48 n. 4. Although a trial court need not make findings regarding every factor, we have remanded awards of alimony when there is an insufficient analysis of the needs of the alimony recipient or the means of the paying party. *Jones*, 835 P.2d at 1179; *Renfro v. Renfro*, 848 P.2d 830, 834 (Alaska 1993). In the present case, the trial court briefly discussed Shannon's lack of job skills and need for reorientation assistance. This provides adequate support for the *decision to award* reorientation alimony, but does not assist this court in reviewing the correctness of the *amount* or *duration* of alimony. We remand for specific findings to support the amount and duration of reorientation alimony.

■ Finally, a court should analyze the relative earning powers and economic situations of the parties in awarding or refusing to award attorney's fees and costs in a divorce case. *See Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1192–93 (Alaska 1987). There is support in the record for the general proposition that John has a greater relative earning power and a better economic situation than

---

4. A pension, like any other marital asset, should be valued as of the date of trial. The earlier date when the marriage has functionally terminated, is often the date of permanent separation, is the date used for segregating marital from post-marital property. *Hanlon v. Hanlon*, 871 P.2d 229, 231 (Alaska 1994). The SBS pension thus has a marital and a non-marital component determined by the date of functional termination of the marriage. The value of the marital component should be assessed as of the trial date by adding net gains to the marital component as

determined by the date of functional termination of the marriage. *See Schanck v. Schanck*, 717 P.2d 1, 4 (Alaska 1986).

5. Even though the PERS pension did not exist as of the date of trial, its "recapture" for purposes of property division is not contested as John has acknowledged Shannon's entitlement to one-half of the PERS funds. *See Jones v. Jones*, 835 P.2d 1173, 1175–76 (Alaska 1992).

Shannon. Nonetheless, we conclude that the decision regarding attorney's fees and costs should be vacated and reevaluated following the court's decision on remanded issues.

## B. THE QDRO WAS VALID.

John argues that the QDRO assigning Shannon an interest in his SBS pension violated the automatic stay imposed from the filing of a bankruptcy action. Shannon responds with a number of legal theories to uphold the QDRO. Initially, we reject Shannon's argument that she received insufficient notice of the bankruptcy filing. A bankruptcy stay is enforceable from the date of filing regardless of notice. *Richard v. City of Chicago,* 80 B.R. 451, 453 (N.D.Ill. 1987); *Butzloff v. Quandt,* 397 N.W.2d 159, 160 (Iowa 1986).

John filed for bankruptcy between the time of the court's initial order granting Shannon a portion of the pension and the issuance of the QDRO.[6] John argues that the automatic stay stops all proceedings relating to pension assets, despite the prior order apportioning those assets. Courts have applied a number of theories to sustain QDROs in similar situations. One theory would hold that the initial order transferred full title of that portion of the pension plan to Shannon and therefore that portion was no longer part of John's debtor estate. *See In re Resare,* 142 B.R. 44, 46 (Bankr.D.R.I. 1992), *aff'd,* 154 B.R. 399 (D.R.I.1993). Another theory would hold that Shannon had an equitable property right to request and receive a QDRO. This equitable property right is not dischargeable in bankruptcy. *See In re Long,* 148 B.R. 904, 908 (Bankr. W.D.Mo.1992). Yet another theory would hold that the order transferred equitable title to the property to Shannon and John held that portion of the pension in a constructive

trust for Shannon's benefit. *See Bush v. Taylor,* 912 F.2d 989, 992–93 (8th Cir.1990); *Long,* 148 B.R. at 909. Property held in constructive trust by the debtor is not considered to be part of the debtor's estate. 11 U.S.C. § 541(d) (1992). Regardless of which theory is used, the order transferred something to Shannon—a full ownership interest, an equitable right, or a constructive title— thereby putting the interest outside of John's bankruptcy estate.[7]

While courts have taken a number of different paths, the destination reached is usually the same. A spouse should not be able to defeat or delay the effect of a property division order by filing bankruptcy. The following quote has been cited frequently to sustain this result:

> We doubt that Congress ever intended that a former wife's judicially decreed sole and separate property interest in a pension payable to her former husband should be subservient to the Bankruptcy Code's goal of giving the debtor a fresh start.

*Bush,* 912 F.2d at 994.

We agree. A valid court order dividing a spouse's pension benefits has an immediate legal effect. The subsequent issuance of a QDRO to meet ERISA requirements is a formality. Shannon's portion of the pension was never part of John's bankruptcy estate. The automatic stay did not apply to that portion and the QDRO affecting Shannon's portion was valid under federal bankruptcy laws. Because we are not faced with the issue, we do not consider the effect of filing for bankruptcy before the divorce trial or the propriety of a court making the initial division of marital pensions while under a bankruptcy stay.

We conclude that the QDRO was valid as

---

6. Drafting a QDRO is a more detailed process than drafting other orders because the QDRO must meet specific federal requirements to be valid under ERISA.

7. Alternatively, an obligation to transfer a portion of a pension may not be a debt dischargeable in bankruptcy because the obligation is not payable until the maturity of the pension. *In re Petersen,* 133 B.R. 508, 511 (Bankr.W.D.Mo.

1991); *Bush,* 912 F.2d at 993. Under this view, bankruptcy does not disturb Shannon's equitable interest or lien, because the pension asset was not payable during bankruptcy. In addition, at least one court has read a broad policy exception to the bankruptcy laws for pension allocations in divorce proceedings. *DiGiacomo v. DiGiacomo,* 256 N.J.Super. 404, 607 A.2d 186, 190–91 (1992).

issued.[8]

### C. THE TRIAL COURT APPLIED A REASONABLE ADAPTATION OF CIVIL RULE 90.3 TO A NOVEL SITUATION.

■ *Determination of child support is governed by Civil Rule 90.3. Alaska R.Civ.P. 90.3 cmt. I(C) ("Rule 90.3 applies to all proceedings involving child support.") However, no provision of Rule 90.3 covers third-party custody arrangements. Therefore, third-party custody arrangements fall under the "unusual circumstances" rubric of 90.3(c)(1)(A). In these situations, trial courts should set the parents' child support payments and allocate the support between the children based on the equities of the case. In the present case, the trial court made a reasonable and practical adaptation of the rule.*

The court created a pool of support money by requiring each parent to pay in 33% of his or her income. Under Civil Rule 90.3, this is the percentage of income the parents are expected to pay to support three children living together. The percentage is 27% for two children and 20% for one child. The percentages reflect the assumption that it is less costly *per child* to care for an additional child in the same household. The court used this assumption to divide the support pool. Rather than divide the support equally between the children, the court allocated the money proportionally according to these percentages. John, with custody of two children, was awarded 57% (27%/(27% + 20%)) of the pool and Mertz, with one child, was awarded 43% (20%/(27% + 20%)). This proportional allocation of a combined support pool was not an abuse of discretion in this case.[9] Equities of other cases may require different approaches.[10]

### III. CONCLUSION

The superior court's judgment relating to child support, division of marital property and debt, reorientation alimony and attorney's fees and costs is VACATED and the case REMANDED for further proceedings consistent with this opinion. There was no error in the issuance of the QDRO. The original QDRO may be modified on remand as appropriate. Child support was calculated by a reasonable and practical adaptation of Civil Rule 90.3 and therefore that determination is AFFIRMED.

---

8. John argues that the QDRO violated various Alaska Rules of Civil Procedure. None of these arguments have merit. First, he complains that the court did not allow him time to respond to the proposed QDRO before it was entered. We find no prejudicial effect because he filed objections to the QDRO and a motion for reconsideration detailing his arguments. *See Johnson v. Johnson*, 544 P.2d 65, 71 (Alaska 1975). Second, he mischaracterizes the QDRO as an untimely motion to amend the judgment under Civil Rule 59(f). The QDRO did not modify the original order, but simply clarified that Shannon's share would continue to grow as the pension account grew with interest. Third, John argues that no motion preceded the order; however, under Civil Rule 78(a), the successful party submits proposed findings, conclusions, and orders without an accompanying motion.

9. The parties agree that once John, Jr. reaches majority child support for Joshua and Carli should be calculated by an application of Rule 90.3 rather than the court's modification of the Rule. We agree.

10. The proportional division used in this case meant that each parent contributed about 14% of his or her income to support the one child in third-party custody with Mertz and about 19% to support the two children living with John. John originally contended that the pool should have been divided equally between the children, rather than proportionally between the households. He abandoned this argument on appeal. An equal division of the pool would have given Mertz 11% for one child and John 22% for two.