*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DIANE M. RUSH, | ) | |
| | ) | Supreme Court No.: S-18621 |
| Appellant, | ) | |
| | ) | Superior Court No.: 3PA-20-01606 CI |
| v. | ) | |
| | ) | O P I N I O N |
| RAY A. RUSH, | ) | |
| | ) | No. 7734 – December 6, 2024 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, John C. Cagle, Judge.

Appearances: John J. Sherman, Sherman Law Office, LLC, Anchorage, for Appellant. Kara A. Nyquist, Nyquist Law Group, Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Borghesan, Henderson, and Pate, Justices. [Carney, Justice, not participating.]

BORGHESAN, Justice.

## I.      INTRODUCTION

This appeal in a divorce case concerns a single issue: whether the superior court correctly determined that funds originating from a woman's employer-provided retirement account were marital property subject to division. The woman's retirement account was created years before the marriage. By the time she married it held over $60,000. The account continued to grow during the marriage. Twice during the marriage some funds were withdrawn from the account and used on marital

expenditures. The remaining funds were later transferred to a different financial institution and then to the account that is the subject of this dispute.

After trial the superior court ruled that the funds in the disputed account were marital. It found that the money in the disputed account originated from the woman's employer-provided retirement account. Although its ruling is not entirely clear, it appears to have reached one of two conclusions: (1) that by withdrawing some funds for marital expenditures, the woman intended to donate the entire account to the marriage, transmuting it into marital property; or (2) that the sums withdrawn were the woman's premarital separate funds, leaving only marital funds in the account. Each of these rulings amounts to legal error.

First, separate funds can be transmuted into marital property by implied interspousal gift only if there is sufficient evidence that the spouse intended to donate her separate funds to the marriage. When a spouse uses some separate funds for marital expenditures, that gift is not sufficient evidence that she intended to also give the remaining separate funds in that account to the marriage. To hold otherwise would contravene our caselaw requiring clear evidence of donative intent. Therefore it was error to rule that by using some funds in the retirement account for marital expenditures, the woman intended to donate all the funds in the account to the marriage.

Second, when a retirement account consists of both premarital separate contributions and marital contributions, and funds are withdrawn for a marital expenditure during the marriage, the default rule (unless the parties otherwise agree) is "first in, last out": premarital separate funds are not withdrawn until all marital funds have been withdrawn. Therefore it was error to rule that the sums withdrawn from the retirement account were the woman's separate premarital funds while classifying the funds remaining in the account as marital.

Because of these legal errors we vacate and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

Ray and Diane Rush married in July 2003 and separated in March 2022. When they married, Diane had a deferred compensation plan based on her employment with the Municipality of Anchorage with a balance between $63,131.23 (the balance as of June 30, 2003) and $67,536.80 (the balance as of September 30, 2003). After they married, Diane continued contributing to the deferred compensation plan until 2006. Diane made large withdrawals for marital expenses — roughly $40,000 in 2009 as a disbursement and $75,000 in 2016 to fund construction of a shop adjacent to the marital home. In 2018 the remaining funds were removed from the deferred compensation plan and placed in a USAA account. In 2020 the money was moved to a Charles Schwab IRA account. The account's value at the time of the trial was $102,100.55. The parties disagree as to whether these funds are marital or nonmarital.

The parties engaged in mediation in March 2022. After the mediation the parties appeared before the superior court to memorialize their agreement.[1] The court described the parties having reached agreement "to allocate the assets and debts of the marriage with one exception and two provisos." One of the provisos related to the disputed account. The court described the key proviso as requiring Diane to provide "additional information to provide what happened with the Charles Schwab IRA . . . to confirm that, in fact, the marital portion of that plan — that account has already been spent."

The parties then described their understanding of what that proviso meant. Diane's counsel stated on the record that he understood the proviso to mean that once Diane provided information to show that approximately $75,000 was withdrawn from the deferred compensation account in 2016, it would be confirmed that the marital portion of the account had been spent. Ray's counsel attempted to clarify the meaning

---

[1]     The mediation did not yield a written agreement.

of the proviso by asking Diane if she agreed "to provide documentation to show that the portions that were transferred out of the Municipality Deferred Comp went into the Charles Schwab account?" Diane agreed. Ray's counsel followed by asking, "You're going to show documentation that any of the remaining funds in the [account] are nonmarital?" Diane agreed. Diane's counsel asserted that this documentation had already been provided, but Ray's counsel disagreed. Diane's counsel stated: "We'll get you another copy, you got it already," and the settlement hearing ended.

The day after the settlement hearing, Diane's counsel provided Ray's counsel with statements confirming the 2016 withdrawals from the deferred compensation account. Ray's counsel responded that she required statements from the time the account was opened until the date of trial. Ray's counsel later articulated an understanding that the mediation proviso was not a conditional agreement that the account was nonmarital, but rather an agreement to provide documentation.

Between the mediation and the trial, counsel exchanged several letters that showed conflicting interpretations of the proviso. Diane's counsel asserted the proviso had been satisfied, so the disputed account should be considered Diane's separate property per the mediated settlement agreement. Ray's counsel responded, "It remains our position that the funds contained in this account are marital and should be divided accordingly by the court." Diane's counsel characterized this response as an attempt to modify the settlement agreement. Ray's counsel responded that they had never agreed the disputed account would be deemed nonmarital.

The parties discussed the status of the disputed account in their trial briefs. Ray argued that the account was a marital asset because Diane had not shown any evidence that the account was funded with nonmarital money. Diane argued that despite obvious disagreement over the meaning of the proviso, the parties had agreed that the account would be nonmarital property.

At trial Diane argued that "the question for the court is to determine what, if anything, of that account is marital." Neither party provided expert testimony to trace

the funds in the disputed account to their source or to calculate the ratio of separate and marital funds in the account. Evidence showed that $40,000 was withdrawn from the deferred compensation account in 2009 as a disbursement and that $75,000 was withdrawn in 2016 to fund construction of a shop on their property. Ray argued that these withdrawals eliminated the nonmarital portion of the account. Diane argued that they eliminated the marital portion of the account. The court stated that it would trace the funds to determine the account's status. During closing argument Diane reiterated her understanding of the mediation agreement as conditionally designating the account as a separate asset.

The superior court ruled that the funds in the disputed account were entirely marital and subject to equitable division:

> **Charles Schwab IRA (81).** This money originated from Ms. Rush's deferred compensation plan. She removed the amount from deferred comp and placed [it] into USAA, then into Charles Schwab. Ms. Rush used funds from this account to pay for marital expenses, including paying for the shop on the property. She claims that since there was a $63,131.23 pre-marital balance, she should have that amount designated as non-marital despite the fact that she withdrew close to that during the marriage to pay for marital expenses. At the date of trial, the total value of this account was $102,100.55. Her argument is not well founded and the court finds that her intent at the time the withdrawals were made was to donate to the marital entity. This is awarded to Ms. Rush in the amount of $102,100.55.

Diane appeals the superior court's ruling. She argues that the superior court erred by failing to uphold the parties' mediation agreement and by classifying the disputed account as marital property.

## III. STANDARD OF REVIEW

"We review questions regarding a trial court's response to a motion to enforce a settlement under the abuse of discretion standard."[2] Determinations of the parties' intent are factual findings, based on the "surrounding facts and circumstances in each case."[3] We review those findings for clear error.[4]

"The characterization of property as separate or marital may involve both legal and factual questions."[5] We review "[u]nderlying factual findings as to the parties' intent, actions, and contributions to the marital estate" for clear error.[6] "[B]ut whether the trial court applied the correct legal rule . . . is a question of law that we review de novo using our independent judgment."[7]

## IV. DISCUSSION

### A. The Mediation Agreement Did Not Resolve The Account's Classification Because The Parties Did Not Reach A Meeting Of The Minds.

Diane argues that the disputed account should be classified as nonmarital based on the parties' mediation agreement. She maintains the superior court erred in failing to address this argument. Ray responds that the court did not err because Diane did not adequately present this argument for the court's decision and because there was no meeting of the minds on the proviso regarding the Schwab account. We conclude

---

**2** *Ford v. Ford*, 68 P.3d 1258, 1263 (Alaska 2003) (citing *Dickerson v. Williams*, 956 P.2d 458, 462 (Alaska 1998)).

**3** *Id.*

**4** *Id.*

**5** *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015) (quoting *Beals v. Beals*, 303 P.3d 453, 458-59 (Alaska 2013)).

**6** *Beals*, 303 P.3d at 459.

**7** *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005) (citing *Schmitz v. Schmitz*, 88 P.3d 1116, 1122 (Alaska 2004)); *see also Kessler v. Kessler*, 411 P.3d 616, 621 (Alaska 2018).

that Diane sufficiently raised the question of enforceability before the superior court. But the superior court's failure to address the argument was harmless because the parties did not reach an enforceable agreement on the classification of the disputed account.

Diane adequately presented the argument for the superior court's decision. Her trial brief states that the parties had an agreement regarding the account. In closing arguments Diane's counsel stated that "[t]here was nothing that wasn't provided that was asked for" and that "[t]he real question for the court is if the court believes that the agreement is a binding agreement." Counsel continued: "So our position is that pursuant to our agreement at mediation, she has basically provided the information she was supposed to provide, because the mediation agreement was, if you can show where this money went and that you basically took out more than you — was considered marital, it's yours." This was enough to preserve the issue for appeal.

However, her argument that the mediation agreement's proviso required the court to classify the Schwab account as her separate property fails on the merits. The record does not support the conclusion that the parties had a meeting of the minds about this proviso.

"An essential requirement of an enforceable settlement agreement is the parties' mutual assent to the agreement's terms."[8] "In order for a contract to have been formed, it [is] essential that acceptance of [the] offer be unequivocal and in exact compliance with the requirements of the offer that [the offeror] ha[s] made."[9] "The mutual assent requirement 'cannot be defeated by the unexpressed subjective intent of

---

[8]     *Colton v. Colton*, 244 P.3d 1121, 1127-28 (Alaska 2010) (citing *Walton v. Ramos Aasand & Co.*, 963 P.2d 1042, 1045-46 (Alaska 1998)).

[9]     *Walton*, 963 P.2d at 1046 (second and third alterations in original) (quoting *Thrift Shop, Inc. v. Alaska Mut. Sav. Bank*, 398 P.2d 657, 659 (Alaska 1965)).

one of the parties; rather, it must rest on an objective manifestation of mutual intent regarding the essential terms of the contract.' "[10]

On appeal the parties offer conflicting interpretations of what they supposedly agreed to. Diane describes the proviso as a conditional agreement to designate the account as separate property if Diane provided documents to prove that the remaining funds were her separate property. Ray characterizes the proviso to be an agreement to provide documentation, nothing more.

The record reveals that the parties never manifested the same understanding of the proviso to which they nominally agreed. The court described the proviso as "[Diane] needs to provide additional information to provide what happened with the [account] . . . to confirm that, in fact, the marital portion of that plan — that account has already been spent." Ray's counsel asked Diane: "You're going to show documentation that any of the remaining funds in the [account] are nonmarital?" Diane agreed. Diane's counsel asserted that such documentation had been provided, but Ray's counsel disagreed.

The disagreement over the proviso's meaning was so apparent to the parties that they refused to sign a written mediation agreement. In a post-mediation email, Diane's counsel asserted that the requested documents had been provided, satisfying the proviso and establishing the account as separate property. Ray's counsel responded: "It remains our position that the funds contained in this account are marital and should be divided accordingly by the court." Diane's counsel characterized this response as an attempt to modify the settlement agreement. Ray's counsel responded that they never agreed the account was nonmarital; rather, they agreed that it was necessary to produce a complete transaction history to verify where the funds came from.

---

[10] *Colton*, 244 P.3d at 1128 (quoting *Howarth v. First Nat'l Bank of Anchorage*, 596 P.2d 1164, 1167 n.8 (Alaska 1979)).

The parties never held the same understanding of the proviso. Without a common understanding of what the essential terms were, there was no "mutual intent regarding the essential terms of the contract."[11] Consequently, the mediation agreement does not control classification of the Schwab account.

### B. The Classification Of The Disputed Account As Marital Property Is Vacated Due To Legal Errors.

The central issue in this appeal is whether the disputed Charles Schwab account contains Diane's separate funds or consists entirely of marital funds. Resolving this issue requires considering the source of these funds and how they were handled over time.

The superior court found that the funds in the Schwab account originated from Diane's employer-provided deferred compensation account. Some of the funds in this account were earned before the marriage and therefore were Diane's separate funds, at least to begin with.[12] When Diane married, subsequent contributions to the account were contributions of marital funds, so the account came to have a mix of Diane's separate funds and the couple's marital funds.[13] The court found that these funds were later transferred to an account at USAA and then to an IRA at Charles Schwab. Based on these findings alone, the Schwab account would be a "mixed secondary asset" — an "account derived from both marital and separate property sources."[14] When faced with a mixed secondary asset, the superior court must trace the

---

[11] *Id.* at 1127-28 (quoting *Howarth*, 596 P.2d at 1167 n.8).

[12] *See Bilbao v. Bilbao*, 205 P.3d 311, 313-14 (Alaska 2009) ("Separate property includes property acquired by one spouse before marriage, property acquired by gift, and property acquired by inheritance.").

[13] *Id.* at 314 ("Assets acquired during marriage such as the salary of a spouse are considered primary marital assets.").

[14] *Id.* (citing *Schmitz v. Schmitz*, 88 P.3d 1116, 1128 (Alaska 2004)).

secondary asset to its sources, "determine the ratio between the sources, and divide the mixed secondary asset into marital and separate property according to that ratio."[15]

The superior court ultimately concluded that by the time the funds in the deferred compensation account were transferred to USAA, the deferred compensation account contained only marital funds. It appears to have concluded either that (1) all funds in the account were transmuted to marital property when some funds were withdrawn to make marital expenditures; or (2) Diane's separate funds were withdrawn, leaving only marital funds in the account. Either conclusion amounts to legal error, as we explain below.

> **1.      Evidence that some funds were withdrawn from the deferred compensation account and used for marital expenditures does not support a finding that Diane intended to give her separate funds remaining in the account to the marriage.**

Separate property may be transmuted into marital property through an implied interspousal gift.[16] An implied interspousal gift occurs when "the *owning spouse*, not the married couple," intends to "donate or convey separate property to the marital unit" so that the "separate property [is] treated as marital property *for the purpose of dividing property in the event of a divorce*."[17] The burden to prove donative intent is on the party claiming an interspousal gift.[18] Under this framework, the superior court made insufficient factual findings to treat the entire account as an interspousal gift.

---

[15]      *Id.*; *see, e.g.*, *Schmitz*, 88 P.3d at 1128 ("The marital and separate interests in a mixed secondary asset are ordinarily in the same ratio as the marital and separate contributions used to acquire the asset." (quoting BRETT R. TURNER, 1 EQUITABLE DISTRIBUTION OF PROPERTY § 5.23, at 266 (2d ed. 1994))).

[16]      *See Kessler v. Kessler*, 411 P.3d 616, 619 (Alaska 2018).

[17]      *Id.* (emphasis in original) (internal quotation marks omitted).

[18]      *See id.* at 621.

The superior court found that it was "[Diane's] intent at the time the withdrawals were made . . . to donate to the marital entity." Ray describes the court's decision as finding a donative intent for the entirety of the account because Diane withdrew significant funds to cover marital expenses.[19] But Diane argues that "[n]owhere in the record is there support for the conclusion that [she] intended to gift the entire balance" of the account; rather, she argues, the withdrawals demonstrate an intent to donate only the amount contributed. Ray responds that the $40,000 withdrawal in 2009 and the $75,000 withdrawal in 2016 for marital expenses, each sum roughly half of the account's value at the time, demonstrate Diane's intent to donate any separate funds remaining in the account to the marriage.[20]

The cases Ray cites do not support this conclusion. Our decision in *Martin v. Martin* involved very different facts.[21] In that case we upheld the superior court's finding that a business the husband purchased before the marriage was marital property when the purchase was financed with marital funds and the wife worked hundreds of hours for the business without pay.[22] Our ruling in that case does not suggest that when a spouse spends a portion of her separate funds on a marital purpose, a court may infer that she intended to give the rest of the (unspent) separate funds to the

---

[19] The superior court stated: "[Diane] claims that since there was a $63,131.23 pre-marital balance, she should have that amount designated as non-marital despite the fact that she withdrew close to that during the marriage to pay for marital expenses. At the date of trial, the total value of this account was $102,100.55. Her argument is not well founded and the court finds that her intent at the time the withdrawals were made was to donate to the martial entity."

[20] In his brief Ray characterizes the $40,000 withdrawal as a $50,000 loan. But this is not entirely accurate. Diane testified that she initially withdrew $50,000 as loan but was unable to pay back around $40,000. Consequently she paid a tax penalty on the remaining $40,000 as an outright disbursement.

[21] 52 P.3d 724 (Alaska 2002).

[22] *Id.* at 726-30.

marriage as well. Ray next points to our decision in *Layton v. O'Dea*.[23] In that case we reversed the superior court's conclusion that investment accounts were the wife's separate property.[24] Ray emphasizes that our decision in *Layton* rested in part on the fact that substantial sums were spent from the investment accounts on home improvement. But in that case the husband testified that the spouses had agreed to transmute the investment accounts into marital property in exchange for treating the wife's salary, which would normally be marital property, as her separate asset.[25] We reversed the trial court's decision because it had not considered the possibility of this spousal agreement.[26] But in this case, there is no comparable evidence of a spousal agreement to transmute the remaining separate funds in the deferred compensation account into marital property.

We have held that a spouse's use of funds from a separate account to pay marital bills is not enough to transmute the separate account into marital property. In *Odom v. Odom*, for example, we held that a husband's "payment of money for marital bills out of his separate account convert[ed] the money actually used into marital property" but "d[id] not, without more, convert the entire separate account into marital property."[27] In *Hansen v. Hansen* we held that "[u]sing part of a premarital account for a marital purpose does not change the balance of the [premarital] account into marital property so long as no new contributions of marital funds to the [premarital] account are made."[28] The decisions are not precisely on point because in this case new contributions of marital funds were made to the deferred compensation account. But

---

[23]    515 P.3d 92 (Alaska 2022).

[24]    *Id.* at 104-05.

[25]    *Id.* at 105.

[26]    *Id.*

[27]    141 P.3d 324, 332-33 (Alaska 2006).

[28]    119 P.3d 1005, 1014 (Alaska 2005).

because traceable separate funds in a retirement account remain separate despite later contributions of marital funds to the account,[29] the basic logic of *Odom* and *Hansen* is just as compelling here. Diane's premarital retirement funds remained her separate property, and the fact that she spent *some* of them on the marriage is not, without more, evidence that she intended to give *all* of them to the marriage. We therefore reverse the superior court's ruling that Diane's separate funds within the account transmuted by interspousal gift.

### 2. When funds are withdrawn from a mixed secondary account for a marital expenditure, the default rule is that marital funds are withdrawn before separate funds.

The superior court appears to have applied a "first in, first out" approach to determine whether separate funds remained in the account after the large withdrawals in 2009 and 2016 — meaning that the separate funds deposited first were also withdrawn first. The court observed that Diane "claims that since there was a $63,131.23 pre-marital balance, she should have that amount designated as non-marital despite the fact that she withdrew close to that during the marriage to pay for marital expenses" but described the argument as "not well founded." Diane argues this was error because we adopted a "first in, last out" approach for withdrawals from mixed assets in *Pasley v. Pasley*: i.e., separate assets acquired first are not used until later-acquired marital assets are exhausted. Ray argues that *Pasley* involved accrued leave, and its holding should not be applied to investment accounts containing both separate and marital contributions. We hold that the rule adopted in *Pasley* applies here.

In *Pasley* we considered how personal leave that could be exchanged for cash was depleted during the marriage when the leave hours were accrued both prior to

---

**29**     *Schmitz v. Schmitz*, 88 P.3d 1116, 1128 (Alaska 2004) ("[I]f possible, the funds must be traced back to their source — either primary marital or primary separate property.").

and during the marriage.[30]  The wife had accumulated 483 hours of leave prior to the marriage.[31]  During the marriage some leave was used and more leave was earned.[32]  At the time of separation the leave balance was 534 hours.[33]  We had previously held that personal leave is a marital asset "akin 'to pension or retirement benefits, another form of deferred compensation.' "[34]  Therefore, we viewed the leave account as a mixed secondary asset, similar to the account in this case.

*Pasley* presented the question of "whether the leave 'withdrawn' during the marriage was marital or separate leave."[35]  We held that "a party who uses accrued personal leave during a marriage first uses marital leave if such leave is available; only after all marital leave has been exhausted does the party start using separate leave" — first in, last out.[36]  Leave earned during the marriage is marital and leave spent during the marriage is a marital expenditure; therefore, we reasoned, marital assets go towards marital expenses.[37]

Diane argues that this same principle applies to the account here, especially since we compared a leave account to a retirement account in deciding *Pasley*.  Ray argues that an investment account is very different from a personal leave account because the value of an investment account does not change uniformly.  If the premarital funds were invested poorly and the marital funds were invested well, the

---

[30]  442 P.3d 738, 749 (Alaska 2019).

[31]  *Id.*

[32]  *Id.*

[33]  *Id.*

[34]  *Schober v. Schober,* 692 P.2d 267, 268 (Alaska 1984) (quoting *Suastez v. Plastic Dress-Up Co.*, 647 P.2d 122, 125 (Cal. 1982)), *quoted in Pasley*, 442 P.3d at 749.

[35]  *Pasley*, 442 P.3d at 749.

[36]  *Id.*

[37]  *Id.*

losses from the premarital funds could be overcome by the growth of the marital funds. Applying the *Pasley* principle of first in, last out, Ray argues, would produce the inequitable result of awarding Diane her separate property regardless of how its value changed over time.

But Ray's argument is far more inequitable because it entails the systematic forfeiture of a spouse's separate property to fund marital expenses without any evidence of donative intent. This is not only unfair; it is contrary to our law on transmutation by interspousal gift.[38]

We therefore adopt here what was implicit in *Pasley*: withdrawals from a mixed retirement account for marital expenses first reduce the marital portion of that account, unless the parties agree otherwise. On remand, the superior court must determine the value of the separate and marital portions of the account following each withdrawal consistent with this principle.

## C. Diane Was Not Required To Demonstrate The Respective Performance Of Marital And Separate Contributions To Sufficiently Trace The Separate Funds.

Ray argues that the court's conclusion can be affirmed on the alternative ground that Diane failed to meet her burden of proof to trace funds in the Schwab account back to her separate premarital funds. We have said "[t]he party seeking to establish that a secondary asset is separate property 'always bears [the] burden of proof; thus untraceable assets are marital property.' "[39] Ray argues that Diane did not meet her burden because she did not present evidence of the respective growth of separate and marital contributions to the deferred compensation account. Therefore, Ray

---

[38] *See, e.g., Kessler v. Kessler*, 411 P.3d 616, 619 (Alaska 2018) (explaining that transmutation by implied interspousal gift "occurs when one spouse intends to donate separate property to the marital estate and engages in conduct demonstrating that intent").

[39] *Bilbao v. Bilbao*, 205 P.3d 311, 314 (Alaska 2009) (alteration in original) (quoting *Schmitz v. Schmitz*, 88 P.3d 1116, 1128 (Alaska 2004)).

maintains, Diane failed to produce sufficient evidence of the ratio of contributions to the Schwab account to permit a finding that some of the Schwab account is Diane's separate property. We disagree.

We stated in *Schmitz* that "[t]he marital and separate interests in a mixed secondary asset are ordinarily in the same ratio as the marital and separate contributions used to acquire the asset."[40] Ray's argument would require a spouse claiming the existence of separate property to show not only the proportion of separate contributions (i.e., the contributions before marriage versus contributions during marriage), but also the respective performance of those contributions after they are made. This approach would require a showing of which contributions were invested in which securities and calculation of the respective gains and losses over time to produce a ratio based on performance as well as contribution. According to Ray, if the spouse fails to make this detailed showing, then the spouse has failed to sufficiently trace the contributions and all of her separate contributions before marriage are transmuted into marital property.[41]

Ray's approach improperly elevates precision at the expense of fairness. If a spouse claiming separate property in a mixed secondary asset establishes the proportion of separate contributions to marital contributions, that spouse has sufficiently traced the separate portion of the retirement account.[42] Of course, the other spouse may present more detailed evidence about the performance of the marital and separate contributions. Expert testimony might persuade the court that the marital and

---

**40**    *Schmitz*, 88 P.3d at 1128.

**41**    *See id.* ("[P]lacing separate property in joint ownership is rebuttable evidence that the owner intended the property to be marital. If evidence is presented that is sufficient to overcome this presumption, tracing can take place." (footnote omitted)). *But see Odom v. Odom*, 141 P.3d 324, 332 (Alaska 2006) ("[I]t is well established in Alaska that the mere commingling of separate property with marital property does not lead to a finding of transmutation.").

**42**    *Schmitz*, 88 P.3d at 1128-29. *See generally* BRETT R. TURNER, 1 EQUITABLE DISTRIBUTION OF PROPERTY § 5:25 (4th ed. 2019).

separate portions of the account should be calculated on a different formula than respective contributions.[43] But we decline to rule that unless a spouse provides that kind of detailed expert testimony, the spouse forfeits her entire separate interest in the retirement account.

Accordingly, Diane's burden was to prove the following: (1) that separate funds were contributed to the deferred compensation account and (2) that those funds can be traced to the account now in dispute.[44] It is uncontested that her separate funds were contained within the original deferred compensation account. And the superior court found that Diane sufficiently traced those funds to the Schwab account now in dispute.[45] Therefore, we remand for the superior court to calculate the respective separate and marital portions of the Schwab account.

---

[43] *See* TURNER, *supra* note 42, § 5:25 ("In the real world, the amount of appreciation will be different every year, and the amount of marital and separate contributions made will differ every year as well. To achieve maximum fairness, therefore, we should determine the marital and separate interests by applying the allocation formula separately for each year in which the parties are married."). *But see id.* § 5:63 ("Many well-constructed tracing arguments have fallen apart because the court did not believe the proponent's evidence on a particular link in the tracing chain.").

[44] *See Schmitz,* 88 P.3d at 1128 ("To characterize a mixed secondary asset, the superior court must know the character of each source feeding into the mixed asset and the amount of value each source contributed to the mixed whole. The court can then determine the ratio between the sources." (footnote omitted)).

[45] Ray does not challenge this specific finding on appeal. And even if he had, there is sufficient evidence to support the superior court's factual finding on this point. The account statements in the record alone do not prove that the $83,077.73 investment into the Schwab account in May 2020 was the same as the $88,407.65 withdrawn from the deferred compensation account in May 2018. But at trial Diane testified that the deferred compensation funds were transferred to a USAA account and "sat there happily" until May 2020, when those funds were deposited into the Schwab account. It is apparent that the court credited this testimony because it found that the funds "originated from [Diane's] deferred compensation plan. She removed that amount from deferred comp and placed into USAA, then into Charles Schwab."

## V.   CONCLUSION

For the foregoing reasons, we VACATE the superior court's division of property and REMAND for further proceedings consistent with this opinion.