Donald H. MARTIN, Appellant,

v.

Melinda K. MARTIN, Appellee.

No. S-9837.

Supreme Court of Alaska.

July 19, 2002.

Rehearing Denied Sept. 5, 2002.

---

Peggy A. Roston, Law Office of Peggy A. Roston, Anchorage, for Appellant.

Barbara A. Norris, Law Office of Barbara A. Norris, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

A husband appealing the property division in a divorce contends that the trial court erred in finding that the parties intended to treat the husband's premarital business as marital property. We affirm, because the husband used marital funds to finance the business and because, at the husband's request, the wife made substantial uncompensated contributions to the business during the fifteen-year marriage. We also affirm the contested property valuations, but reverse the award of the husband's premarital camera to the wife.

## II. FACTS AND PROCEEDINGS

Melinda and Donald Martin met in 1979, began living together in 1980, and married in 1985. Don began managing his sister's Anchorage health food store, Roy's Health Foods (Roy's), in 1971. Don purchased the store for $140,000 in 1980.[1] Don has been a full-time, salaried employee of Roy's since purchase. Melinda has worked full-time for the State of Alaska since 1978. Melinda also worked at Roy's on a part-time basis from 1980 to 1999. Melinda and Don separated in January 1999 and divorced in October 2000.

In dividing the property during the divorce, the trial court determined what property was available for distribution, valued that property, and divided it "50/50" between the parties. The court characterized Roy's as marital property. Don argues on appeal that Roy's is his separate property, not subject to equitable division by the court. Don also disputes the court's valuation of the parties' weekend cabin on the Kenai Peninsula, undeveloped land in Arizona, and Alaska Airlines frequent flier mileage accounts. Finally, Don argues that the court abused its discretion by failing to award him a portion of Melinda's state employee retirement account and by awarding his Nikon camera to Melinda.

## III. STANDARD OF REVIEW

Equitable division of marital assets is a three-step process: determining what property is available for distribution, assessing the property's value, and allocating the property equitably.[2] We review the trial court's characterization of property as separate or marital for abuse of discretion.[3] Whether the trial court applied the correct legal rule in exercising its discretion, however, is a question of law that we review de novo using our independent judgment.[4] Whether the court correctly valued the assets to be divided is a question of fact that we review for clear error.[5] Finally, we review the court's ultimate distribution of the assets under an abuse of discretion standard, and will only reverse if the distribution is clearly unjust.[6]

## IV. DISCUSSION

### A. The Court Did Not Err in Holding that Roy's Health Foods Was Marital Property.

Because Don purchased Roy's Health Foods prior to marriage, Roy's would ordinarily be considered his separate property, not subject to equitable division.[7] How-

---

1. Don formed a closely-held corporation to make the purchase. Don also paid his sister $30,000 to execute a non-competition agreement.

2. *Lundquist v. Lundquist*, 923 P.2d 42, 46–47 (Alaska 1996); *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983).

3. *Lundquist*, 923 P.2d at 47.

4. *Brown v. Brown*, 947 P.2d 307, 308 (Alaska 1997).

5. Alaska R. Civ. P. 52(a); *Doyle v. Doyle*, 815 P.2d 366, 368–69 (Alaska 1991).

6. *Brotherton v. Brotherton*, 941 P.2d 1241, 1244 (Alaska 1997).

7. AS 25.24.160(a)(4) permits courts to divide property "acquired only during marriage."

ever, under the doctrine of transmutation, separate property can become marital property if the parties so intend.[8] The trial court found that "[t]he words and acts of the parties before and during marriage *establish their intent* that the health foods store was a family business." (Emphasis added.) The court accordingly characterized Roy's as marital property.[9] Don argues that despite the trial court's express finding of intent, the court improperly relied on a mixture of legal theories to reach its conclusion. Because the evidence supports the court's express finding of intent, we affirm the court's characterization of Roy's as marital.

 Don argues that many of the court's findings supporting its conclusion are not relevant to the parties' intent. Indeed, the two findings immediately preceding the trial court's finding that the parties intended to treat Roy's as a family business support an active appreciation theory rather than a transmutation theory.[10] The court noted that Don paid almost $117,000 of the promissory note on Roy's through his marital efforts and reasoned that the resulting equity increase should be considered marital property, just as it would be if Don had earned this money as take-home pay:

18. Almost $117,000 out of $140,000 purchase price of the store was paid during the marriage. This is money that [Don] generated by spending time and energy on the store. He spent his marital employment time and energy creating financial gain which he used to buy an asset. If he had not used his employment time and energy to buy the store, he would reasonably have been expected to use that time and energy generating income that would have been marital. [I].e., [Don] spent his marital time and energy generat-

ing resources to pay for approximately 80% of what he claims is a non-marital asset.

19. There is no evidence that defendant was employed other than in the business. There is evidence that income from the business was used to support the family unit. To find that the business was non-marital would ... [be] contrary not only to a preponderance of the evidence in the case, but also contrary to the legal view of marriage as an economic unit.

These findings do not directly bear on whether the parties intended to treat Roy's as marital property. Rather, they suggest that the appreciation in Roy's should be treated as marital property because it derived from Don's marital efforts.

Don further asserts that the court expressly and incorrectly disavowed any reliance on the parties' intent in reaching its conclusion. In the paragraph following its finding of intent, the court qualified its conclusion by stating that the parties' intentions were not entitled to much weight:

21. The "parties' intention" as an element of determining whether a business purchased before marriage became marital *cannot reasonably be given the same weight or meaning* as the "parties' intent" in determining whether a business transaction occurred between non-marital partners because spouses are not dealing with the business in an arms-length transaction.

(Emphasis added.) Melinda responds that the court did not reject the intent standard, but merely noted that the standard should be applied more liberally in the context of a marital relationship. Both Don and Melinda are partially correct; the court properly distinguished the context of marriage from that

---

8. *Nicholson v. Wolfe*, 974 P.2d 417, 423 (Alaska 1999) (citations omitted). Intent is demonstrated through the words and actions of the parties during marriage. *Sampson v. Sampson*, 14 P.3d 272, 277 (Alaska 2000).

9. The parties stipulated that the equity in Roy's at the valuation date was $125,000. The parties also stipulated that the balance on the promissory note used to purchase Roy's was almost $117,000 at the time of marriage, and that the note was completely paid by 1994.

10. Under the doctrine of active appreciation, any increase in value of separate property owing to marital efforts is considered marital property subject to equitable division. *See Lowdermilk v. Lowdermilk*, 825 P.2d 874, 877–78 (Alaska 1992) (holding that increase in value of husband's pre-marital business owing to husband's "contributions of time and energy" during marriage was marital property); BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.22 (2d ed.1994) (explaining doctrine and collecting cases).

of typical business deals, but erroneously de-emphasized the significance of the parties' intent in applying the transmutation doctrine.

Don argues that these are the same errors that caused us to reverse in *Nicholson v. Wolfe*.[11] We noted in that case that the trial court erroneously relied upon equitable considerations in concluding that the husband's premarital business should be considered marital property:

> The trial court did not find that the Northstar assets were marital because the parties intended to treat them as such. Instead, it found that it would be unfair to treat the property as separate, since both parties had contributed significant efforts to the business during the marriage.[12]

We held that "[w]ithout finding that the parties intended to convert [the husband's premarital business] to marital property, the trial court could not properly consider the business to be a marital asset."[13] Accordingly, we vacated the trial court's decision and remanded with instructions to treat the husband's premarital business as separate property "unless it expressly finds an act or acts that demonstrate the parties' intent to treat the property as marital."[14]

Melinda argues that the court satisfied *Nicholson* by making an express finding of intent and by noting several specific acts evincing this intent. The trial court found that marital funds were used to finance the business and that Melinda had worked at the store for many years without pay.

As noted above, the trial court "runs together" the doctrine of transmutation, which is based on the parties' intent, with the doctrine of active appreciation, which is based on equitable considerations.[15] These theories are analytically distinct, and should be treated as such.[16] But it would be unduly formalistic to reverse the trial court on this basis if the record actually supports the court's express finding of intent. Accordingly, we consider whether the court abused its discretion in finding that the parties intended to treat Roy's as a "family business."[17]

Don argues that the record does not support the trial court's finding that the parties intended to treat Roy's as marital property. Don first argues that Melinda did not play a substantial role in the business during the marriage. The court found, however, that Melinda "contributed effort and energy to the business ... during the marriage" and worked at the store without pay "in the early and mid–1990s."

In *Chotiner v. Chotiner* we summarized the types of conduct that might evince an intent to convert separate property.[18] Of particular pertinence here, we noted that separate property can become marital when the non-owner spouse lends her credit to improve the property or otherwise "devote[s] substantial efforts to its management, maintenance, or improvement."[19] Conversely, we have repeatedly held that non-substantial efforts are insufficient to demonstrate the requisite intent.[20]

---

11. 974 P.2d 417 (Alaska 1999).

12. *Id.* at 423.

13. *Id.* (citation omitted).

14. *Id.* at 424.

15. *See Sampson*, 14 P.3d at 277 (noting that trial court's analysis "runs together the doctrines of transmutation of separate property into marital property and invasion of separate property"); Turner, Equitable Distribution § 5.22 (explaining equitable basis of active appreciation doctrine).

16. *Sampson*, 14 P.3d at 277 (noting that equitable considerations have no direct bearing on whether parties intended to treat property as part of marital estate).

17. *Green v. Green*, 29 P.3d 854, 857 (Alaska 2001) (citation omitted).

18. 829 P.2d 829, 832–33 (Alaska 1992).

19. *Id.*

20. *E.g., Nicholson*, 974 P.2d at 424 (holding wife's limited help with bookkeeping and answering phone insufficient to support implicit finding of intent to hold husband's premarital business jointly); *Brooks v. Brooks*, 733 P.2d 1044, 1054 (Alaska 1987) (holding wife's "limited maintenance and management tasks" relating to apartment complex did not "rise to the level of active interest in the ongoing maintenance, management and control of the property necessary to demonstrate an intent to hold the apartment complex jointly"); *Wanberg*, 664 P.2d at 573 & n. 19 (holding wife's minor efforts at remodeling

Don argues that Melinda's level of involvement in the store dropped appreciably before the marriage in 1985. Nonetheless, even by the most conservative estimate she logged hundreds of hours at the store and at trade conventions over the parties' fifteen-year marriage.[21] More importantly, she was only paid for a fraction of that time. The court found that Melinda only began receiving paychecks in 1997, after a hiatus of at least seven years, so that she could obtain social security benefits and participate in the corporation's profit-sharing plan.[22] The majority of Melinda's work contributions, therefore, went directly to the earned surplus of the corporation.

Melinda further testified that Don demanded that she work at the store. She testified that she did so without pay because she considered it her marital obligation to help out with the family business. Although Melinda's hours at the store decreased once she moved to the day shift of her state job, she testified that she still helped out when she could, or when Don was short-staffed. Melinda testified that Don "said a couple of times, 'We have a goldmine here, we have to take care of it.' " Don's failure to record her time or compensate her for her time and Melinda's willingness to fill in whenever she could without pay strongly suggest that both parties intended to treat the store as a joint enterprise.

Don alternatively argues that Melinda's contributions were not substantial because she did not play a management role at Roy's. He asserts that her tasks were mostly clerical and janitorial. Melinda, on the other hand, argues that she trained employees, often represented the store at trade conventions, and acted as decision-maker while Don was away on vacation.[23] It is not necessary to resolve this dispute, however, because we have never held that the non-owner spouse must have equal decision-making authority to demonstrate an intent to hold property jointly. In *Lundquist v. Lundquist* we affirmed the trial court's finding that the parties intended to treat the husband's fishing boat as a joint asset where the wife testified that she worked on the boat as a deck hand, shopped and cooked for the crew, and tended to the business while her husband was out fishing.[24] Like the wife in *Lundquist,* Melinda contributed substantial efforts that helped maintain the business and contribute to its growth.[25] Whether these efforts were primarily oriented towards non-managerial tasks is irrelevant—the salient fact is that they substantially contributed to the business.

This case also resembles *Lundquist* in that marital funds were used to finance the business.[26] Melinda documented checks totaling $31,000 written from marital accounts to Roy's in the 1990's. Don admitted to writing the checks. Accordingly, the court found that "marital funds were used in the business." Don disputes this finding, arguing

rental property and collecting rent insufficient to demonstrate intent to transmute property); *see also McDaniel v. McDaniel,* 829 P.2d 303, 306 (Alaska 1992) ("Participation by both spouses in the management and maintenance of the property will not automatically transform pre-marital into marital property. Rather, the participation must be significant and evidence an intent to operate jointly.").

21. From 1980 to 1983 Melinda worked at Roy's approximately fifteen to twenty hours per week. Her hours dropped to approximately four hours per week after she switched to the day-shift in 1983, and dropped further after the parties purchased a weekend cabin on the Kenai Peninsula in 1995.

22. Melinda supports this finding by noting that Don did not keep track of Melinda's hours, so that the paychecks could not have been tied to the amount of labor she performed.

23. While Melinda's own evidence and testimony suggest that her tasks were generally non-managerial, several employees testified that she was second in command to Don at the store.

24. 923 P.2d 42, 47 (Alaska 1996).

25. *Id.* Don argues that *Lundquist* is distinguishable because the wife in that case quit other employment to work on her husband's fishing boat. Assuming this to be correct, we did not consider this fact significant enough to mention in our opinion in *Lundquist,* and we did not rely on it in reaching our conclusion.

26. *See id.* (noting wife's claim that marital funds were used to make improvements to boat as well as to pay off loan on boat).

that the checks were "probably" just loans to Roy's from the profit-sharing plan in which both Don and Melinda participated and that the marital bank accounts were just conduits for the loans.

Don explains that participants in the profit-sharing plan were allowed to borrow up to fifty percent of their vested balance. Because the corporation was not allowed to borrow from the plan directly, Don would borrow from the plan and loan the borrowed funds to the corporation by writing a check from a personal account. The corporation would pay him back, and he would in turn reimburse the profit-sharing plan. In Don's accountant's words, the transactions were "a wash."

But the fact that a loan is repaid does not change the nature of the transaction. Calling a repaid loan "a wash" belies the element of risk associated with every loan.[27] Don's vested balance in the profit-sharing account was a product of his marital efforts, and therefore marital property.[28] Accordingly, Melinda's equitable share of Don's marital efforts was placed at risk by this lending arrangement. Furthermore, Don's accountant admitted that at least one of the loans had not been repaid as of the last accounting before trial. The court's finding that marital funds were used in the business is not clearly erroneous.

We have never reversed a trial court's finding of intent to transmute when the non-owner spouse made uncompensated contributions to the premarital owner's enterprise of the magnitude present in this case. Don disputes Melinda's characterization of her contributions, but we will not reverse the court's implicit decision to credit Melinda's testimony over his.[29] The record adequately supports the main thrust of Melinda's argument—that she assumed that she was working for the family business and that Don

either shared that belief or opportunistically allowed her to persist in that belief. Accordingly, the court did not abuse its discretion by finding that Don and Melinda intended to treat Roy's as joint property.

## B. The Court's Disputed Valuations Are Not Clearly Erroneous.

### 1. The Kenai cabin

■ The trial court valued the parties' Kenai cabin at $108,500. This was the value attributed in a broker's estimate Don requested in anticipation of litigation. The court noted that the parties purchased the cabin for $85,000 in 1995 and spent just over $27,000 on improvements. In rejecting Don's expert's appraisal obtained after Don rejected the broker's estimate, the court found:

> It is unreasonable and therefore, not creditable that after the parties spent $27,000 improving a home on the Kenai, it decreased in resale value to less than the purchase price. [Melinda's] contention that $108,500 is FMV for the Kenai house and guest cabin is more credible than Defendant's self-serving appraisal obtained at his behest after rejecting a broker letter re: resale value.

Don argues that the court's finding is clearly erroneous because the broker's estimated value was just "a starting place to list the property for sale and not the present value of the property." Don also notes that his expert appraised the property at $91,000, a value greater than the original purchase price. Melinda argues that Don simply shopped for a lower value after he was dissatisfied with the broker's conclusion because he knew that he would end up owning the cabin, and therefore stood to gain by obtaining the lowest possible valuation. The trial

---

27. In this regard, the case at bar is distinguishable from *Money v. Money*, in which we held that premium payments on a separate life insurance policy made from a marital account were exactly offset by policy dividends, and that therefore the wife could not claim to have contributed any funds toward maintaining the policy. 852 P.2d 1158, 1162–63 (Alaska 1993).

28. Plan participants are required to make contributions based upon a percentage of their compensation. Therefore, Don's plan balance is simply another form of income, no different for purposes of equitable division from Melinda's state retirement account.

29. *See Lundquist*, 923 P.2d at 47 (noting that trial court properly chose to believe wife's version of events).

court weighed the credibility of the witnesses and clearly agreed with Melinda. The court's insignificant error regarding the appraisal notwithstanding, its conclusion was based on professional analysis (the broker's estimate) and its evaluation of Don's motives in obtaining a second opinion. This finding is clearly within the trial court's wide latitude in finding facts, and is not clearly erroneous.

### 2. The Mojave property

 The trial court accepted Melinda's submission of a 1993 appraisal valuing one of the parties' undeveloped Arizona parcels at $1,900. Don argues that the value of this property is actually $1,166, a figure he determined by writing to the Mojave Land Owners Association. He did not submit any documentary evidence of this correspondence. The trial court's decision to rely on the appraisal obtained during the marriage rather than Don's unsupported assertion at trial is not clearly erroneous.

### 3. The Alaska Airlines mileage accounts

 The trial court accepted Melinda's accountant's testimony that the parties' Alaska Airlines mileage was worth two cents per mile. Don argues that because the parties cannot actually sell their mileage, it has no fair market value. Melinda correctly responds that market transferability is not a prerequisite to determining value for property division purposes. Fair market value is defined as the price a willing buyer would pay to purchase the asset on the open market from a willing seller.[30] Melinda's expert testified that a buyer could purchase Alaska Airlines mileage for two cents per mile. The fact that Don or Melinda cannot sell their mileage does not preclude the court from determining what price a buyer would pay for their mileage. Put another way, an asset need not be marketable if the court can

objectively determine that it has value to its owner. Thus, the court's finding is not clearly erroneous.

### C. The Court Did Not Err in Awarding All of Melinda's State Retirement Account to Melinda.

 The trial court awarded Melinda her entire state retirement account. Don argues that the court abused its discretion by not awarding him a nominal amount of this account so that he would be eligible to purchase major medical benefits under AS 39.35.535(d).[31] Assuming that Don is correct that a nominal award from Melinda's state retirement account would make him eligible for coverage, we hold that the court did not abuse its broad discretion in denying him any portion of the account. Don offered no evidence at trial that he had no other means of obtaining health insurance, nor does he offer any argument to this effect on appeal. Don essentially argues that he would substantially benefit from such an award at no cost to Melinda. But we will only reverse the trial court's disposition of the marital estate if the court has abused its discretion and produced a clearly unjust result.[32] Because there is no evidence of such abuse or injustice here, we affirm the court's award.

### D. It Was Error To Award the Nikon Camera to Melinda.

 Finally, Don argues that the court abused its discretion by awarding Melinda the Nikon camera he owned before the marriage. Melinda argues that the court must have found that the parties intended the camera to become joint property. Melinda testified that she used the camera extensively throughout the marriage, that Don consented to this use, and that he rarely used it. But consent to use, without more, is not enough to evince an intent to transmute separate premarital property. Accordingly, it

---

**30.** Turner, Equitable Distribution § 7.03, at 505.

**31.** AS 39.35.535(d) provides:

[A] member's former spouse who receives a monthly benefit under a qualified domestic relations order is entitled to receive major medical insurance coverage if the former spouse

(1) elects the coverage within 60 days after the first monthly benefit paid under the order is mailed . . . ; and

(2) pays the premium established by the administrator for the coverage.

**32.** *Brotherton v. Brotherton,* 941 P.2d 1241, 1244 (Alaska 1997).

was error to characterize the camera as marital property, and an abuse of discretion to award it to Melinda.

## V. CONCLUSION

For these reasons, we VACATE the award of the Nikon camera to Melinda and REMAND so that the camera can be reclassified as non-marital property. We otherwise AFFIRM the findings and decree on all points.