Blanton FORTSON, Appellant/Cross–Appellee,

v.

Jayne FORTSON, Appellee/Cross–Appellant.

Nos. S–11332, S–11341.

Supreme Court of Alaska.

Feb. 17, 2006.

Rehearing Denied April 12, 2006.

Susan Orlansky, Feldman & Orlansky, Anchorage, for Appellant/Cross–Appellee.

Bruce A. Bookman, Bookman & Helm, LLP, Anchorage, for Appellee/Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Blanton and Jayne Fortson divorced after eighteen years of marriage. In this property division case, both parties appeal the superior court's decision to award sixty percent of the marital estate to Jayne and forty percent to Blanton. Because the court did not abuse its discretion in dividing the marital estate, we affirm the sixty-forty division. The parties raise an additional seven issues on appeal. For the reasons set out below, we affirm the court's requirement of a cash payment to Blanton, its treatment of capital gains taxes and selling costs for marital land in Hawaii, its treatment of loans from Jayne's parents, its valuation of the parties' boat, and its treatment of a capital loss carry forward. We reverse the court's determination that excess profits earned by Jayne's medical clinic during the parties' separation are her separate property. Finally, we decline to consider whether the superior court erred in its treatment of alleged gifts from Blanton to Jayne because Jayne has failed to show that, if there was error, it was prejudicial.

## II. FACTS AND PROCEEDINGS

Blanton and Jayne Fortson married in 1985 and separated in October 2001 after sixteen years of marriage; Blanton filed a complaint for divorce that month. The couple attempted to reconcile following the separation, and the initial complaint for divorce was withdrawn, but in July 2002 Jayne filed for divorce, and the case eventually went to trial on property issues. Throughout the marriage, the Fortsons enjoyed an affluent lifestyle. The Fortsons have three children, but custody and support of the children is not at issue in this appeal.

Jayne is a dermatologist with a successful clinic in Anchorage. She is also a paraplegic and uses a wheelchair due to a 1975 accident. Over the years she has experienced various medical problems related to her condition,

including a 1996 hip accident that left her with significant pain and fatigue. Because of her health, she works less than five days a week. She will have significant medical expenses in the future and is at high risk of suffering an accident that would end her ability to work. Because of her medical condition, her remaining work life is likely less than the sixteen to seventeen years generally predicted for an educated forty-seven year old woman.

Blanton has a nursing degree and over the course of the marriage worked as a nurse, a commercial fisherman, and a part-time supervisor in Jayne's office. Blanton stopped working as a nurse in 1989 and his nursing license has now lapsed. He last worked as a fisherman in 1999. He also worked at the clinic; from October 2001 until May 2002, Blanton was on its payroll and was paid an annual salary of $65,000. He is deaf in one ear and has a weakened back that limits him to light lifting.

Trial took place before Superior Court Judge Sharon Gleason during a six-day period in May–June 2003. The parties disputed several issues. These issues, and the facts relevant to them, are set out briefly here.

(1) *Division of the marital estate.* The court distributed the couple's marital property on a 60/40 basis, awarding the larger share to Jayne. Judge Gleason focused on the parties' long-term health prospects, commenting that:

> [W]hen I am called here as a judge to apply the *Merrill* factors it's to . . . discern what the future holds for each party. The statistical odds for Mr. Fortson of major complications in his health precluding him from functioning in a society from working are very low, and . . . those statistical probabilities for Dr. Fortson are extremely high. She faces major health complications in her future because of her paraplegia, and it is this factor to which I've given greatest weight in arriving at a division of the parties' estate, and . . . the related need for additional funds to meet the health related needs of . . . Dr. Fortson.

At trial one of Jayne's witnesses, a vocational counselor, stated that Blanton was qualified for various nursing or health management positions with salaries ranging from $30,600 to $79,000. Blanton offered the testimony of another counselor, Marjorie Linder, who suggested a three-year program where Blanton would return to school to become a vocational rehabilitation counselor. The court, however, rejected Linder's testimony because she did not consider his current earning capacity and only engaged in general career planning. The court held that Blanton had an earning capacity of $50,000, and concluded that neither rehabilitation spousal support nor reorientation alimony were necessary in this case.

The court acknowledged that Jayne's earning capacity was ten times Blanton's, but observed that "her health is very fragile and her earning capacity could be reduced to zero at any moment if she falls from her wheelchair." Judge Gleason continued that Jayne's health problems "are going to severely impact [her] long-term earning capacity," and thus concluded that "I recognize the disparity in the parties' earning capacities, but the issues surrounding Jayne's health outweigh the disparity."

Both parties attack different aspects of this property division. Blanton, relying primarily on Jayne's significantly larger income earning capacity, argues that the superior court abused its discretion in not awarding him a greater portion of the marital estate. Jayne, pointing to large loans from her parents that she alone repaid or remains responsible for repaying, argues that she should have received greater consideration from the court in its property division.

(2) *Cash payments from Jayne to equalize the property division.* The court ordered Jayne to make cash payments totaling $388,200 to Blanton to complete the division of property. Jayne was ordered to make monthly payments of $3,500 to Blanton for eighteen months, followed by a final lump sum payment for the remaining balance. On reconsideration, the court ordered that the principal should earn 3.75% interest during this interim period. Jayne challenges the order, specifically arguing that the superior court did not take into account the hardship

that she would face in financing the lump sum payment to Blanton.

(3) *Excess profits from Jayne's dermatology clinic.* The parties disputed whether the clinic had any marketable goodwill and whether it earned any income from activities other than Jayne's work as a physician. In addition to dermatology services, Jayne's clinic also offers non-medical therapies and sells cosmetic and skin care products. In the five years preceding the divorce, Jayne's yearly take-home income averaged $550,000. Blanton's expert, Donovan Rulien, opined that a physician of Jayne's experience would earn a salary of $375,000 and thus concluded that Jayne earned "excess profit over wages" totaling $272,800 during the period of separation. Jayne's expert, Frederick Strand, disagreed. He testified that an appropriate salary for someone of Jayne's experience would be forty percent of the clinic's billings, or $508,000, and that given an average yearly cashflow of $455,000, there were no excess profits. He also criticized Rulien's analysis, and maintained that even assuming a $375,000 salary, no excess profits were present.

The court rejected much of Rulien's analysis, finding it not credible because "[h]is results conflicted with his own methodology, and he relied solely on national average compensation figures that were not linked to conditions in Anchorage, or even Alaska." Judge Gleason instead adopted a modified version of Strand's second analysis, which incorporated the $375,000 salary figure; she noted that there could be roughly $20,000 in excess earnings, but then concluded that the issue was rendered moot by the clinic's lack of marketable goodwill.

(4) *Capital gains taxes and sales costs of Hawaii property.* The couple owned Hawaii property worth $1.5 million. At trial, a Hawaii lawyer testified that sale costs would amount to thirteen percent of the total value, leaving the owner with $1.3 million in proceeds. The attorney testified that upon sale, the capital gains tax on the property would

amount to $120,800. The couple also owns other real estate, including a Stuckagain Heights property, the family home, and the medical condominium that houses Jayne's clinic. The court awarded all of the couple's real estate to Jayne. The court declined to grant Jayne a credit for capital gains taxes and sales costs on the sale of the Hawaii property on the grounds that it did not order her to sell the property.

(5) *Loans from Jayne's parents.* The couple received a series of payments from Jayne's parents; at trial the parties disputed whether they should be treated as loans or gifts. The first payment was for $280,000 in 1986, and was used to purchase the fishing boat Blanton used in the 1980s. Although the couple made two payments on this sum, the bulk of it was repaid when Jayne gave her parents investments originally purchased with the money she received as part of her 1975 accident settlement.[1] Jayne's parents also gave the couple $80,000 in 1990 and $150,000 in 1996. Both Jayne and Blanton signed the 1986 and 1990 notes, but only Jayne signed the 1996 note. No payments have been made or demanded on the 1990 or 1996 notes. The court held that Jayne had not established that there was a legal obligation to repay these loans. The court also declined to include Jayne's repayment of the first loan in its tally of marital assets and debts. The court gave "limited weight" to the contribution made by these loans and "extremely limited weight" to the effect failure to repay them may have on Jayne's inheritance from her parents.

(6) *The LEAH MAYA.* The parties own the LEAH MAYA, a 51-foot power boat. While the couple had used the boat for hunting charters, it was mainly used for family pleasure. Blanton estimated the boat was worth $200,000, and his expert, Larry Westfall, estimated that the vessel's fair market value was $195,000. Based on Westfall's testimony, the superior court valued the LEAH MAYA at $195,000 and awarded it to Blanton. The superior court declined to allow Blanton a deduction for costs associated with taking the

1. The investments' exact value is unclear. Jayne's father invested the settlement proceeds but did not keep any formal records. He estimated they were worth "something less" than the $245,000 remaining on the loan. Jayne testified that the investments were worth roughly $240,000.

boat to Seattle for sale because it did not order him to sell the boat, noting that Blanton could use the boat for charters in Alaska.

(7) *Capital loss carry forward.* Blanton suffered substantial losses day-trading in the stock market. These losses generated a capital loss carry forward, a tax offset that can be applied to future income tax liabilities (including capital gains taxes) of $519,500. The parties disputed to whom this carry forward should be assigned. The court held that it should be divided in the same proportion as the division of the marital estate: sixty percent to Jayne and forty percent to Blanton.

(8) *Gifts as separate property.* The parties identified personal items with a combined value of $5,540; Jayne claimed these items were gifts to her from Blanton, while Blanton denied that items totalling $4,250 in value were intended as gifts. The superior court held that interspousal gifts are marital property and divided them as part of the marital estate.

### III. STANDARD OF REVIEW

■ Equitable division of marital assets is a three-step process: determining what property is available for distribution, assessing its value, and allocating it equitably.[2] The trial court's characterization of property

as separate or marital is reviewed for abuse of discretion.[3] Whether the trial court applied the correct legal rule in exercising its discretion is a question of law that we examine *de novo* using our independent judgment.[4] The valuation of property is a question of fact and is reviewed for clear error.[5] A finding of fact is clearly erroneous if, upon review of the entire record, we are left with a firm and definite conviction that a mistake has been made.[6] The superior court's ultimate distribution of assets is reviewed for abuse of discretion, and will be reversed only if the distribution is clearly unjust.[7]

### IV. DISCUSSION

#### A. The Superior Court Did Not Abuse Its Discretion in Dividing the Marital Estate.

■ Under AS 25.24.160, trial courts must consider specific factors in dividing property.[8] In making its division, "the trial court generally should begin with the presumption that an equal division of marital property is most equitable."[9]

##### 1. The superior court did not err in awarding Blanton forty percent of the marital estate.

■ Blanton maintains that the superior court abused its discretion in awarding him a

---

2. *Martin v. Martin*, 52 P.3d 724, 726 (Alaska 2002).

3. *Id.*

4. *Id.*

5. *Id.*

6. *Schmitz v. Schmitz*, 88 P.3d 1116, 1121 (Alaska 2004).

7. *Martin*, 52 P.3d at 726.

8. Alaska Statute 25.24.160(a)(4) states in relevant part:
 [T]he division of property must fairly allocate the economic effect of divorce by being based on consideration of the following factors:
 (A) the length of the marriage and station in life of the parties during the marriage;
 (B) the age and health of the parties;
 (C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;
 (D) the financial condition of the parties, including the availability and cost of health insurance;
 (E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;
 (F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;
 (G) the circumstances and necessities of each party;
 (H) the time and manner of acquisition of the property in question; and
 (I) the income-producing capacity of the property and the value of the property at the time of division.
 These factors are commonly known as the *"Merrill* factors," as listed in *Merrill v. Merrill*, 368 P.2d 546, 547–48 n. 4 (Alaska 1962).

9. *Brown v. Brown*, 947 P.2d 307, 313 (Alaska 1997) (citation omitted); *Wanberg v. Wanberg*, 664 P.2d 568, 574–75 (Alaska 1983).

less than equal share of the estate. In Blanton's favor are the facts that the parties were married for many years, enjoyed an affluent lifestyle, and the court's finding that Blanton contributed to the marriage. However, cutting against him is the key fact that Jayne faces long-term medical liabilities. Blanton argues that the superior court's distribution represents an abuse of discretion because it overcompensated for Jayne's health concerns, was based on various factual errors, and was motivated by a desire to punish him for his spendthrift ways.

We have recognized that "[w]hen a couple has sufficient assets, the spouse with the smaller earning capacity can and should receive a larger share in the property distribution." [10] Blanton posits that in light of the disparity between his earning capacity of $50,000 a year and Jayne's $500,000 earning capacity, a 60/40 award in Jayne's favor was an abuse of discretion. However, the statutory factors for distribution include the consideration of "the age and health of the parties," "the financial condition of the parties, including the availability and cost of health insurance," and "the circumstances and necessities of each party." [11] Moreover, we look to see whether the property division was adequate to meet the parties' needs while they made the transition into post-marital life. [12] In this case Jayne will face substantial healthcare costs that are likely to increase as she gets older, [13] her ability to earn income will likely fall as her healthcare costs increase, and she is uniquely vulnerable to injuries or accidents that would have immediate and catastrophic effects on her ability to earn income. At the same time, Blanton has a reasonable earning capacity and has received a portion of the estate large enough to help him make the transition into post-marital life. In light of these facts, a 60/40 property division in favor of Jayne was well within the trial court's discretion.

Blanton also argues that the court abused its discretion in failing to award him any of the couple's real estate or "income producing" assets. [14] Judge Gleason emphasized that "there [are] lots of liquid funds that have been received by Mr. Fortson" and explained that "I have looked at the fact of the liquid assets that were placed into Mr. Fortson's control, the LEAH MAYA, the hangar proceeds, the Cessna 206. That ... comprises $400[,000] to $500,000 of cash." Blanton maintains that the boat is not an income generating asset because it was primarily used for family activities. But it was also used for charters, remains equipped for such work, and could be outfitted for commercial fishing. Its ability to generate income is determined not by its past usage, but by its future capabilities, and thus it is an income generating asset. Accordingly, we reject Blanton's suggestion that he was not awarded any income generating assets. Moreover, the fact that he was awarded liquid funds, many of which were given to him while the parties were separated, undermines his argument; cash can readily be used to purchase income generating assets. While the superior court awarded Jayne most of the income generating assets, this was not an abuse of discretion given our overall conclusion that the court did not abuse its discretion in awarding Jayne sixty percent of the marital estate.

Blanton also asserts that the trial court improperly penalized him for what it viewed as his financially irresponsible ways. He relies on the trial court's statement that "if

---

**10.** *Dodson v. Dodson*, 955 P.2d 902, 914 n. 19 (Alaska 1998) (quoting *Dixon v. Dixon*, 747 P.2d 1169, 1173 (Alaska 1987)).

**11.** AS 25.24.160(a)(4)(B), (D), & (G).

**12.** *See Dixon*, 747 P.2d at 1173 (property division should consider transition needs of parties); *cf. Hilliker v. Hilliker*, 755 P.2d 1111, 1112 (Alaska 1988) (rehabilitation alimony appropriate only where property division cannot meet reasonable needs of party).

**13.** Jayne's expert predicted her future lifetime medical expenses would range between $1.3 million and $3.3 million.

**14.** In addition to the medical practice and the medical condominium, Blanton also classifies the Stuckagain Heights and the Hawaii property as "income producing" because they can be sold for more than their purchase price. The Hawaii property was valued at $1.5 million, or $1,000,050 above its purchase price. The Stuckagain Heights property saw minor appreciation, gaining $3,000 in value since its purchase.

Mr. Fortson ... were accorded more than 50 percent of the marital estate there's every indication that that would be spent solely on extravagances." Had the court based its property distribution award on a judgment about the propriety of his spending habits, it would have abused its discretion.[15] However, the court's language is part of a larger discussion that contrasts Blanton's relatively minor future liabilities with Jayne's large impending health costs. In the context of that discussion, the statement is unobjectionable and to some extent superfluous; the rest of the court's discussion, as well as its written findings of fact and conclusions of law, demonstrate that the property distribution was motivated not by a desire to punish Blanton but by the realization that Jayne faced large, possibly catastrophic, healthcare costs in the coming years. Given the extensive evidence in support of this conclusion, we reject Blanton's suggestion that the distribution was designed to punish him.

In addition, Blanton maintains that the trial court's finding that he has an earning capacity of $50,000 is clearly erroneous. He challenges the testimony of Jill Friedman, Jayne's vocational expert, that he would be eligible for various supervisory nursing positions, arguing that he has back problems and has not worked as a nurse in fourteen years. However, Friedman explained that Blanton could regain his nursing license in as little as nine weeks. She offered a list of possible salary ranges for nurses in the Anchorage area; while she mentioned some positions with salary ranges between $30,600 and $56,000 per year, she also discussed a nurse supervisor position which paid between $52,000 and $79,000 and noted that Blanton's resume stated that he had worked as a nurse supervisor at Jayne's office. Moreover, the trial court found the testimony of Blanton's expert to be unpersuasive, viewing her as a general career planner who failed to address his actual earning capacity, and Blanton did not offer any other evidence on this issue. While the trial court's finding that Blanton could earn $50,000 may assume that he can secure a more senior position, given that it is within the range offered by the expert and

below the $57,000 mean wage for nurses in the Anchorage area, the finding was not clearly erroneous.

Blanton also suggests that his lack of health insurance supports a larger award, arguing that once his COBRA insurance lapses, he will face uncertain insurance costs. However, COBRA insurance lasts three years from the time of divorce; during those three years, full coverage costs $556 per month. Thus, even if the trial court's assumption that Blanton's insurance would be provided by his future employers turns out to be false, he has access to alternative sources of insurance for a reasonable amount of time. The mere possibility that he may have to buy his health insurance in the future does not support increasing his share of the marital estate.

In sum, we conclude that none of Blanton's claims of error have merit and that the superior court did not abuse its discretion in allocating Blanton a forty percent share of the marital estate.

### 2. The court did not err in awarding Jayne sixty percent of the marital estate.

■ Jayne argues that the court erred in failing to give appropriate weight to her use of separate funds to benefit the marriage. Specifically, she argues that the trial court erred by failing to grant sufficient weight to (1) her payment of roughly $240,000 to her parents for the first loan, and (2) her $107,000 contribution towards the Stuckagain Heights property.

In distributing the marital property, the superior court gave "limited weight" to the fact that roughly $600,000 was contributed to the parties by Jayne's family allegedly as loans. The court concluded that Jayne did not establish by a preponderance of the evidence that these payments created any legal obligation of repayment; accordingly, it concluded that "no adjustment is required based on these payments." Jayne argues that the trial court erred by not separating out from this amount the $240,000 Jayne contributed

15. *See Jones v. Jones,* 942 P.2d 1133, 1139 (Alaska 1997) (holding that courts may consider eco-nomic misconduct only when it rises to level of unreasonable depletion of marital assets).

from her premarital funds to repay her parents for their 1986 commercial fishing loan.[16] Jayne argues that the court's discussion of her payment was insufficient and that the court was required to consider the fact that she contributed separate funds to pay off this loan.

The superior court also accorded limited weight to Jayne's use of her separate funds to purchase the Stuckagain Heights property, concluding that she intended to transmute the funds into marital property. Jayne argues that the court's treatment of her separate contributions amounts to an abuse of discretion.

We have held that contributions of separate property may be relevant to equitable division.[17] However, we have not held that failure to make an adjustment for such contributions constitutes an abuse of discretion.[18] The superior court considered the alleged loans and Jayne's contribution of premarital funds into the Stuckagain Heights property, and accorded these facts "limited weight." Jayne's argument would require us to conclude that the trial court should have explicitly stated how much weight it was according to her use of premarital assets to repay a portion of the loans, and to quantify that declaration with precision. Because the court need only take separate payments into account at its discretion, and given that the court considered the general impact of the loans and held that they were not marital debts, we conclude that it did not abuse its discretion by refusing to give more weight to Jayne's contributions. Jayne may disagree with the weight accorded to these contributions, but that alone does not support a conclusion that the trial court abused its discretion.

## B. The Superior Court Did Not Err in Fashioning the Terms of Jayne's Payment of a Cash Settlement to Blanton.

On cross-appeal, Jayne argues that the trial court failed to make specific findings about the hardship imposed by the cash award. Specifically, she contends that the court failed to consider whether costs related to financing the large lump sum payment would impose an undue hardship on her.

Cash awards are a permissible means of dividing illiquid marital assets where they would not impose a hardship on the paying party.[19] In this case, the trial court considered the effects of the cash award on Jayne's finances. First, in its oral decision, the court noted that it was allowing Jayne eighteen months to pay the lump sum in consideration of the fact that "it might take [Jayne] some time to reorganize finances, obtain any refinancing on the Hawaii property, or undertake other financial considerations of considerable priority...." Second, in deciding Blanton's motion for reconsideration, the court again considered Jayne's health and granted Jayne the right to alter the payment schedule if she could not comply due to changes in her health or employment. Thus, the court carefully considered the potential hardships of the award, giving Jayne time for financial restructuring, taking into account her health concerns, and allowing for necessary adjustments as time goes on. In light of this record, we reject Jayne's contention that the court did not consider the possible hardships of the payment plan.[20]

---

16. This first loan was used to benefit the marriage; the parties used the funds to purchase the fishing boat used by Blanton, the vessel generated marital income, and when they sold the boat, the parties deposited the sale proceeds into a marital account.

17. *Green v. Green*, 29 P.3d 854, 860 (Alaska 2001).

18. *Id.*; *Chotiner v. Chotiner*, 829 P.2d 829, 834–35 (Alaska 1992); *cf. Ramsey v. Ramsey*, 834 P.2d 807 (Alaska 1992) (no fixed rule requiring credit for contributions from post-separation property to maintain marital property).

19. *See Green*, 29 P.3d at 861; *Johns v. Johns*, 945 P.2d 1222, 1228 (Alaska 1997).

20. Jayne argues in the alternative that she should have received a credit for any financing costs necessary for her to obtain the cash. However, we have never held that financing costs demand a credit, and indeed, implicit in the trial court's decision is the fact that Jayne's income is sufficient to bear refinancing costs without drawing on her share of the marital estate. Thus, we reject Jayne's alternative argument.

## C. The Superior Court Erred in Treating Excess Profits Earned by the Clinic During the Separation Period as Jayne's Separate Property.

■ "Marital property includes all property acquired during the marriage, 'excepting only inherited property and property acquired with separate property which is kept as separate property.' "[21] The clinic was started during the marriage, and Jayne's primary means of employment was her clinic work. The parties do not dispute that the business was marital property.

■ However, spousal income earned after a final separation leading to divorce is not marital property.[22] Blanton accepts this general principle but argues that some of the post-separation profit that Jayne earned from the business was not her separate income, but represented "excess earnings" or profits stemming from the other clinic activities, such as the efforts of various technicians and sales of speciality services and cosmetics. He posits that these profits are marital property.[23] Jayne responds that the superior court found that all of the business profits were from her sole efforts and that there were no excess profits.

■ We agree with Blanton that the court erred in declining to consider the amount of separation period excess earnings. The clinic's unmarketability made it unnecessary to determine the value of the clinic's goodwill.[24] But lack of goodwill does not address and is irrelevant to the separate question of whether there were profits from clinic activities other than Jayne's efforts as a dermatologist during the separation period that should be divided between the parties.[25] Thus, because the court relied on its resolution of the goodwill issue to avoid examining the clinic's excess profits, it erred.

Jayne relies on the language of the superior court's written order, arguing that its statement that there "may be" $20,000 in excess earnings and its failure to apportion any earnings support the conclusion that there were no excess profits. However, the court's oral decision and an exchange between the court and Blanton's counsel support Blanton's argument that the court did find there to be some excess profits. But the court then declined to consider the source of this profit or its value based on its conclusion, which was unrelated to the excess profits issue, that the practice lacked marketable goodwill.[26]

Because the court acknowledged that some excess profits existed, but then failed to identify the source of these profits or quantify their value, we reverse its decision to treat

**21.** *Schmitz v. Schmitz*, 88 P.3d 1116, 1125 (Alaska 2004) (quoting *Lewis v. Lewis*, 785 P.2d 550, 558 (Alaska 1990)).

**22.** *Schanck v. Schanck*, 717 P.2d 1, 3 (Alaska 1986) ("property accumulated with income earned after a final separation that is intended to, and does in fact, lead to a divorce is excluded from the category of marital property, as long as it is obtained without the invasion of any pre-separation marital asset.").

**23.** This court has defined excess earnings as "earnings which remain after earnings on tangible assets and owner's compensation for services are deducted from total earnings." *Moffitt v. Moffitt*, 813 P.2d 674, 676 n. 3 (Alaska 1991).

**24.** *See Moffitt v. Moffitt*, 749 P.2d 343, 347 (Alaska 1988) ("If the trial court determines either that no good will exists or that the good will is unmarketable, then no value for good will should be considered in dividing the marital assets.").

**25.** Jayne suggests that Blanton cannot argue that any profits resulted from activities other than her efforts because he did not present sufficient evidence at trial. However, Blanton questioned her about billing spreadsheets detailing income based on the work of her employees and the trial court admitted this evidence into the record.

**26.** The court's explanation of its calculations in the oral hearing make it clear that the court found there to be some excess profits. After discussing Strand's figures and adopting them subject to minor changes, the court noted that its analysis "result[ed] in excess income somewhere in the neighborhood of $20,000 that could be attributable to the intangible components of the business." Moreover, when Blanton's counsel asked whether the "interim profits that Dr. Fortson earned from the business during the separation period [were] not a marital asset," Judge Gleason replied, "I think that's implicit in my ruling. . . . [I]n terms of her income . . . that's her income, and post-separation earnings were not included in this division." In addition, the superior court did not determine the source of these excess profits, and simply noted that they were "attributable to the intangible component of the business."

excess profits from the clinic as Jayne's separate property. On remand, the court should determine what portion of the clinic's post-separation income involved excess profits stemming from clinic activities above and beyond Jayne's work as a dermatologist and then classify this sum as marital property.

### D. The Superior Court Did Not Err in Refusing To Give Jayne a Credit for the Capital Gains Taxes and Selling Costs of the Hawaii Property.

 Jayne argues that the superior court erred in refusing to give her a credit for costs and capital gains taxes associated with selling the Hawaii property. In *Oberhansly v. Oberhansly*,[27] we held that trial courts are required to consider the tax consequences of property division where there is proof of an "immediate and specific tax liability," but cautioned that "[a]t the same time, the court is not required to speculate on or to consider tax consequences in the absence of proof that a taxable event will occur in connection with the division of property."[28] However, in *Dodson v. Dodson*[29] we allowed trial courts to consider tax liabilities regardless of whether the liabilities were immediate and specific, recognizing that consideration of possible tax consequences is within the trial court's discretion when distributing property.[30] Jayne maintains that the court abused its discretion by refusing to grant her a credit for the taxes and sale costs associated with selling the Hawaii property, arguing that *Dodson* overruled *Oberhansly* and requires a credit even where a sale is not immediate and "regardless of why or when [a party] chooses to sell the property." However, Jayne misreads *Dodson*. While *Dodson allows* the superior court to consider tax consequences to reach an equitable outcome, it does not mandate the credit, and *Oberhansly* requires the credit only where the tax effects are specific and immediate. Because the court did not require Jayne to sell the property, the tax effects were not specific and immediate, and the court did not abuse its discretion in denying Jayne a credit for possible tax effects and costs resulting from a sale.

We have also required courts to consider sales costs where the division of property is "premised on an economically disadvantaged party being forced to sell a house."[31] Where a court order or external conditions force a party to sell, the court must grant the party necessary costs because "the court's failure to make provision for the costs of repairs and sale of the real property awarded ... defeat[s] its stated goal of awarding [an economically disadvantaged party] the greater share of the marital estate."[32] However, Jayne's financial circumstances do not require that she sell the Hawaii property. She could not in any sense be characterized as economically disadvantaged. In addition, the court specifically allowed her eighteen months to refinance the property. Because the sale is not inevitable, we hold that the trial court did not abuse its discretion by refusing to grant her the costs of selling the property.

### E. The Superior Court's Finding that the Loans from Jayne's Parents Were Not Legally Enforceable Is Not Clearly Erroneous.

 Jayne disputes the trial court's finding that the loans from her parents were not legally enforceable marital liabilities. Blanton responds that the court had sufficient reason to doubt that they were bona fide debts, and thus that it did not err in excluding them as marital debts.

The evidence supporting the validity of the loans is equivocal. Factors such as Jayne's repayment of the fishing boat loan, her sister's repayment of a similar loan, and the testimony of Jayne and her father that they intended that the loans be repaid support a

27. 798 P.2d 883 (Alaska 1990).

28. *Id.* at 887; *accord Money v. Money*, 852 P.2d 1158, 1163 (Alaska 1993).

29. 955 P.2d 902 (Alaska 1998).

30. *Id.* at 909.

31. *Beal v. Beal*, 88 P.3d 104, 117 (Alaska 2004) (citing *Tollefsen v. Tollefsen*, 981 P.2d 568, 571–72 (Alaska 1999)).

32. *Tollefsen*, 981 P.2d at 572.

finding that the loans were valid debts. But several factors cut against the validity of the loans, including Blanton's failure to sign the 1996 notes, his testimony that he did not regard the loans as legal debts, and Jayne's father's testimony that he never demanded payment and never received nor asked for interest on the loans even though the demand notes state an interest rate. This failure to demand payment or interest on the loans is particularly probative given that it likely renders at least the 1990 loans unenforceable; under Alaska law, failure to demand payment, coupled with no payments on the loan principal or interest for more than ten years, triggers the statute of limitations.[33] The trial court is the factfinder, and given the evidence in the record supporting its decision, we cannot say that its finding that the loans were not marital debts was clearly erroneous.[34]

### F. The Superior Court's Valuation of the LEAH MAYA Is Not Clearly Erroneous.

Blanton argues that the court erred in valuing the LEAH MAYA at $195,000. Blanton's pre-trial property spreadsheet listed the vessel's value at $195,000, he testified that the vessel was worth $200,000, and he and his expert, Larry Westfall, testified that it had a fair market value of $195,000. However, Blanton maintains that even though the court based its valuation on his expert's testimony, the court erred in relying on either his or Westfall's opinions because he is a layperson and Westfall qualified his opinion.[35] This argument is unpersuasive. Having presented substantial evidence on the point, Blanton now will not be heard to argue that the trial court erred in accepting his evidence.[36]

Because Blanton was personally familiar with the vessel and Westfall was knowledgeable about the overall market for such vessels, and because both reached a similar conclusion, the superior court did not commit clear error by relying on their testimony. Moreover, to the extent that the testimony was deficient, Blanton must bear the consequences because parties seeking to establish an item's value must shoulder the burden of producing supporting evidence.[37] Blanton acknowledges that he bore the burden for creating an evidentiary record on this issue, but argues that his failure to offer better

---

33. Alaska Statute 45.03.118(b) states in relevant part:

 [I]f demand for payment is made to the maker of a note payable on demand, an action to enforce the obligation of a party to pay the note must be commenced within six years after the demand. If no demand for payment is made to the maker, an action to enforce the note is barred if neither principal nor interest on the note has been paid for a continuous period of 10 years.

34. *See generally* Charles C. Marvel, Annotation, *Unexplained Gratuitous Transfer of Property From One Relative to Another As Raising Presumption of Gift,* 94 A.L.R.3d 608 (1979) (courts commonly view loans between family members with suspicion, and thus apply rebuttable presumption that loans between close relatives are not actual debts); 59 Am.Jur.2d *Parent and Child* § 92 (2002) (same).

35. We have defined fair market value as "[t]he amount at which property would change hands, between a willing buyer and a willing seller, neither being under compulsion to buy or sell and both having reasonable knowledge of the relevant facts." *Doyle v. Doyle,* 815 P.2d 366, 370 n. 6 (Alaska 1991) (quoting BLACK'S LAW DICTIONARY 597 (6th ed.1990)). Westfall noted that the $195,000 figure was not a reflection of

what a buyer would pay, but was instead a guess as to the value a surveyor would give to the vessel. Blanton thus argues that Westfall did not actually measure the vessel's fair market value and that there was insufficient evidence in the record to support the court's valuation of the LEAH MAYA.

36. *Cf. Koller v. Reft,* 71 P.3d 800, 804 (Alaska 2003) (trial court did not err in relying on income figures provided by appellant).

37. *See Brotherton v. Brotherton,* 941 P.2d 1241, 1245 (Alaska 1997) ("[This court has] previously held that it is the duty of the parties, not the court, to ensure that all necessary evidence is before the court in divorce proceedings and that a party who fails to present sufficient evidence may not later challenge the adequacy of the evidence on appeal.") (quoting *Root v. Root,* 851 P.2d 67, 69 (Alaska 1993)); *see also Hartland v. Hartland,* 777 P.2d 636, 640 (Alaska 1989) ("[It] is the parties' obligation to present the court with sufficient evidence of the value of the property. Reviewing courts cannot continue to reverse and remand dissolution cases where the parties have had an adequate opportunity to introduce evidence but have failed to do so.") (quoting *In re Marriage of Smith,* 114 Ill.App.3d 47, 69 Ill.Dec. 827, 448 N.E.2d 545, 550 (1983)).

evidence should be excused because he was not put on notice that the vessel's value would be an issue at trial. He also maintains that because Jayne's original trial brief stated that the parties intended to sell the LEAH MAYA and divide the proceeds, valued the ship at $125,000, and stated that the court need not value the boat, she should be estopped from disputing Blanton's claim that the trial court's finding was based on improper evidence. But a review of the trial proceedings belies Blanton's claims.

Jayne testified on May 22, the second day of trial, that she did not intend to sell the boat and was unaware of any plans to sell it with Blanton, and Blanton offered his testimony about the boat's value the next day. On May 23 the trial court informed the parties that it was going to award the boat to one of them, and on May 28, the fourth day of trial, Jayne submitted an amended trial brief which stated that "Dr. Fortson is agreeable to allocating the LEAH MAYA to Mr. Fortson at whatever the court decides is the appropriate value." Westfall testified later that same day. This chronology belies Blanton's argument that he lacked notice about the need to present valuation evidence. Jayne's testimony, as well as Judge Gleason's statement and Jayne's amended trial brief, made it clear that the value of the boat would be an issue at trial. Blanton was thus repeatedly put on notice that the trial court was going to value the LEAH MAYA. If he was concerned about the sufficiency of his evidence, he should have requested a continuance so that he could secure a more accurate valuation of the vessel. Because he chose to proceed with trial, he cannot now claim that a finding based on his own evidence is clearly erroneous.[38] Accordingly, we conclude that the superior court did not commit clear error in valuing the LEAH MAYA.

### G. The Superior Court Did Not Err in Allocating the Capital Loss Carry Forward on a 60/40 Basis.

■ Jayne argues that the trial court abused its discretion in failing to award her the entire amount of the capital loss carry forward because she has the ability to immediately apply it against capital gains taxes associated with selling the Hawaii property.[39] However, as Jayne concedes, Blanton could also use the loss carry forward; $3,000 may be taken against ordinary income each year. Although Jayne estimates that it may take Blanton as long as eleven years to use his share of the loss carry forward, he can still derive value from it, so long as he has some taxable income. Thus, we conclude that the court did not err in dividing the capital loss carry forward 60/40. Jayne may be able to secure more immediate benefits from the capital loss carry forward, but that does not mean that Blanton would not also receive benefits from some share of the carry forward. The court did not abuse its discretion in making its allocation of the carry forward.

### H. Because Jayne Has Failed To Show Prejudicial Error in the Classification of Gifts, We Decline To Reach This Issue.

■ At trial, Jayne claimed that various items of property totaling $5,540 in value were gifts to her from Blanton, and were therefore her separate property. Blanton testified that two of the items, totaling $4,250 in value, were not gifts to her, but were either purchased by both parties with the intent of replacing an item in the household that had worn out (a Husqvarna sewing machine valued at $3,500) or an item of clothing that Jayne had purchased for herself (an otter parka valued at $750). Blanton therefore argues that these items were marital property that should be subject to division as to value. Judge Gleason appears to have credited Blanton's testimony.[40] To the ex-

**38.** *Cf. Jenkins v. Handel,* 10 P.3d 586, 592 (Alaska 2000) (party waived claims regarding lack of notice about admitted evidence where party found out evidence one day prior to hearing and failed to request continuance or object during hearing).

**39.** Jayne calculates she would save roughly $31,170 if she were allowed to apply Blanton's forty percent share of the capital loss carry forward towards capital gains taxes associated with selling the Hawaii property.

**40.** "I was talking more about the otter [parka] and the various other items Mr. Fortson said he really didn't intend … to be gifts, he meant those to be investments, and I gave him credit for those various items."

tent that the property purchased with marital assets was not intended by one spouse to be a gift to the other, it could not be found to be separate property. Accordingly, at most only $1,290 in property might arguably have been found to be Jayne's separate property. This case involves a total marital estate valued at over $2.8 million. The gifts in dispute represent less than .05% of the estate.

The process of classifying marital property in a divorce is not an end in itself but simply serves to inform the trial court's decision on the ultimate issue of what constitutes an equitable distribution of the marital estate. Because the trial court exercises broad discretion in making its final equitable determination, a classification error will result in prejudice only when it appears that the error probably had an appreciable effect on the ultimate determination of equitable distribution. Here, given the minor amount in controversy and the size of the estate, any error in classifying the disputed property would have at most a negligible effect on equitable distribution. Therefore, Jayne has failed to carry her burden of showing prejudicial error.

## V. CONCLUSION

Because we hold that the trial court erred in declining to consider the amount of any excess profits earned by Jayne's clinic during the separation period, we REMAND for determination of the size of this amount and its distribution. We AFFIRM the trial court's decision in all other respects.

EASTAUGH and FABE, JJ., not participating.